**Duaut A. DUAMUTEF,**
Plaintiff–Appellee,

v.

**Melvin L. HOLLINS, Superintendent, and P. Almstead, Defendants–Appellants.**

**Docket No. 01–0041.**

United States Court of Appeals, Second Circuit.

Argued: Jan. 7, 2002.

Decided: July 18, 2002.

See also 159 F.3d 1346.

Duaut A. Duamutef, Fishkill Correctional Facility, Beacon, NY, pro se.

Marcus J. Mastracco, Assistant Solicitor General, State of New York, Albany, NY (Eliot Spitzer, Attorney General, Daniel

Smirlock, Deputy Solicitor General, on the brief), for Defendants–Appellants.

Before: JACOBS, F.I. PARKER, and SOTOMAYOR, Circuit Judges.

SOTOMAYOR, Circuit Judge.

Plaintiff, a prison inmate, brought this claim under 42 U.S.C. § 1983 for damages against prison officials who he claims arbitrarily censored his mail in violation of his First Amendment rights when they placed a 30–day "mail watch" on him. Plaintiff has a history of disciplinary problems in the prison system and involvement in an organization that advocates the overthrow of the government and other "revolutionary" activity. Defendants' decision to institute the temporary mail watch was triggered by plaintiff's receipt through the mail of a book with the phrase "Blood in the Streets" as part of the title. The book, however, is about economics and is not of an inflammatory nature. The United States District Court for the Northern District of New York (Mordue, J.) denied defendants' motion for summary judgment on the basis of qualified immunity. We reverse. In light of plaintiff's history and the urgent need to forestall security problems in correctional facilities, we hold that no rational jury could find that defendants' decision to institute a temporary mail watch was not reasonably related to legitimate penological interests. Therefore, there was no constitutional violation and, in any event, defendants are entitled to qualified immunity.

## BACKGROUND

Plaintiff Duaut A. Duamutef was an inmate at the Oneida Correctional Facility, where defendants were administrators. Plaintiff brought suit, *pro se*, alleging that beginning on May 5, 1995, a "mail watch" was arbitrarily placed on his incoming and outgoing mail by defendants in retaliation

for a grievance filed for inadequate medical treatment. The district court denied that claim. On appeal, this Court affirmed that decision but found that a liberal reading of the *pro se* complaint also revealed a First Amendment claim for arbitrary mail censorship. We therefore remanded for consideration of the latter claim. *See Duamutef v. Hollins*, 159 F.3d 1346, 1998 WL 537838 (2d Cir.1998) (unpublished table decision). On remand, the district court accepted briefs and evidentiary submissions. The court granted defendants' motion for summary judgment as to another defendant but denied summary judgment as to defendants Hollins and Almstead on the ground that questions of fact remained as to their motivations. Defendants Hollins and Almstead (hereinafter "defendants") filed a motion for reconsideration, arguing that they should be granted summary judgment on the basis of qualified immunity. The district court denied the motion for reconsideration and defendants appeal the denial.

The facts relevant to this appeal are as follows. Plaintiff has a history of disciplinary problems and involvement in prohibited organizational activities within Department of Corrections facilities since 1985. In September 1985, plaintiff was found guilty of violating prison rules of conduct for having misappropriated a prison printing press to print fliers for distribution to inmates. The fliers concerned an organization devoted to the promotion of prisoners' rights and the concept of "overthrowing the government" and "creating violence and disorder" in society. Plaintiff was also subjected to disciplinary action in 1989 and 1990 for unauthorized organizational activities and demonstrations. Plaintiff was disciplined again in 1994 in connection with a charge that he had deliberately misaddressed mail containing correspondence advocating violent overthrow of the government—so that

upon return of the mail from the post office, the correspondence would be seen by Department of Corrections personnel. Enclosed with the letter was an outline of the "New African Liberation Movement Platform and Agenda," which plaintiff has admitted to supporting and circulating. The document called for, among other things, (1) "the uprootment of western imperialism," (2) "the liberation of all political prisoners and prisoners of war held in the United States and across the nation," and (3) "revolutionary actions against those that oppress or participate in the oppression of the Black community." The document further stated: (1) "We believe that our people, as well as other colonized and oppressed people, will never be free until imperialism is completely and permanently destroyed and uprooted from planet earth," and (2) "We· recognize no other authority than the authority of the revolution and the people."

In May 1995, prison mailroom staff opening general, non-privileged correspondence came across a publication addressed to plaintiff which contained the phrase "Blood in the Streets" in the title and had what the staff perceived as a "provocative tone." This discovery was brought to the attention of defendant Almstead, a corrections lieutenant with supervisory responsibilities, and in turn to defendant Hollins, the Superintendent of Oneida Correctional Facility. Almstead and Hollins contend that they were concerned about the security implications of the receipt of provocative materials by the inmate population. On May 5, 1995, in light of the allegedly inflammatory materials coupled with plaintiff's disciplinary history, defendant Hollins authorized a 30 day "mail watch" on all of plaintiff's incoming and outgoing mail.

Defendants have conceded for present purposes that the alleged subversive publi-

cation was, in fact, an economics book by James Dale Davidson and Sir William Rees Magg, entitled "Blood in the Streets: Investment Profits in a World Gone Mad." The back cover of the book credits Baron Nathan Rothschild as stating, "The time to buy is when blood is running in the streets." The book discusses an investment philosophy based on the "Rothschild Principle" of buying when prices are low and realizing profits in the "coming years" of "financial upheaval when blood will indeed 'run in the streets.'" Plaintiff further claims, and defendants do not dispute, that the book is freely available through the general library system at several correctional facilities.

## DISCUSSION

Plaintiff alleges that defendants violated his First Amendment rights when they unlawfully censored his mail by stopping, opening and reading all non-privileged correspondence. The district court denied defendants' motion for reconsideration of this issue, finding that defendants were not entitled to summary judgment on the basis of qualified immunity. The district court acknowledged that the issue of qualified immunity is generally a question of law to be decided by the court. The court found, however, that even after defendants conceded that the allegedly inflammatory publication was in fact a harmless economics book, questions of fact remained. *See Duamutef v. Hollins,* 95–CV–0853, Memorandum Decision and Order, at 5 (N.D.N.Y. Feb. 5, 2001). Specifically, the district court found that the question of defendants' *"motivation* in ordering a mail watch on plaintiff is hotly contested." *Id.* (emphasis in original). The court stated, "The record in this case would permit a rational factfinder to infer that defendants undertook to open and read plaintiff's mail not because of a then clear and present security risk but, as plaintiff contends, be-

cause of his past history of illicit organizational behavior or some other factor unrelated to legitimate penological concerns." *Id.* at 5–6. The district court concluded that because "[t]he question of defendants' motivation in this case cannot be decided as a matter of law," *id.* at 6, defendants were not entitled to summary judgment on the basis of qualified immunity. The court further held that "[a] jury could conclude that it was unreasonable for defendants to focus on the title of the controversial publication rather than its content and that plaintiff's previous unauthorized organizational activities were too remote in time to justify opening and reading his otherwise private mail." *Id.* We disagree.

 The doctrine of qualified immunity shields government officials from liability for civil damages when their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). This doctrine " 'strikes a balance between the need, on one hand, to hold responsible public officials exercising their power in a wholly unjustified manner and, on the other hand, to shield officials responsibly attempting to perform their public duties in good faith from having to explain their actions to the satisfaction of a jury.' " *Poe v. Leonard,* 282 F.3d 123, 131 (2d Cir.2002) (quoting *Locurto v. Safir,* 264 F.3d 154, 162–63 (2d Cir.2001)). "The 'better approach' to resolving such claims is to first determine whether the plaintiffs have alleged a violation of a constitutional right, and then, if they have, to determine whether the right was clearly established at the time of the alleged violation." *African Trade & Info. Ctr., Inc. v. Abromaitis,* 294 F.3d 355, 359 (2d Cir.2002) (quoting *County of Sacramento v. Lewis,* 523 U.S. 833, 841 n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043

(1998)). *But cf. Horne v. Coughlin*, 178 F.3d 603, 606–07 (2d Cir.1999) (holding that we may, in certain circumstances, decline to decide whether there was a constitutional violation where we conclude that the right was not clearly established at the relevant time). Therefore, before applying the qualified immunity standard, we ask whether there was a constitutional violation in the first instance. *See Stuto v. Fleishman*, 164 F.3d 820, 825 (2d Cir. 1999).

It is well established that while "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution," *Turner v. Safley*, 482 U.S. 78, 84, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), prison restrictions that implicate prisoners' constitutional rights may be upheld if they are "reasonably related to legitimate penological interests," *id.* at 89, 107 S.Ct. 2254; *see also Purnell v. Lord*, 952 F.2d 679, 682 (2d Cir.1992). "The [Supreme] Court has counseled judicial restraint in the federal courts' review of prison policy and administration, noting that 'courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.'" *Giano v. Senkowski*, 54 F.3d 1050, 1053 (2d Cir. 1995) (quoting *Turner*, 482 U.S. at 84, 107 S.Ct. 2254). "Moreover, the doctrines of separation of powers and federalism (where, as here, a state penal system is involved) dictate a policy of judicial restraint." *Id.* (citing *Turner*, 482 U.S. at 85, 107 S.Ct. 2254).

This policy of deference is heightened with respect to the specific issue of "maintaining prison security and protecting against increased inmate violence," *id.* at 1054, which the Supreme Court has described as "central to all other corrections goals," *Thornburgh v. Abbott*, 490 U.S. 401, 415, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989) (quoting *Pell v. Procunier*, 417 U.S. 817,

823, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974)). As we have explained, "[p]rison officials must be given latitude to anticipate the probable consequences of certain speech, and must be allowed to take reasonable steps to forestall violence." *Giano*, 54 F.3d at 1055 (citations omitted). The Supreme Court has specifically acknowledged the prison system's interest in monitoring "incoming publications," that is, "material requested by an individual inmate but targeted to a general audience." *Thornburgh*, 490 U.S. at 412, 109 S.Ct. 1874. "Once in the prison, material of this kind reasonably may be expected to circulate among prisoners, with the concomitant potential for coordinated disruptive conduct." *Id.* Therefore, the Court has advised that "[i]n the volatile prison environment, it is essential that prison officials be given broad discretion to prevent such disorder." *Id.* at 413, 109 S.Ct. 1874.

In connection with this concern about the security threats posed by incoming mail, the Supreme Court has upheld broad restrictions on prisoners' receipt of written materials. *See Turner*, 482 U.S. at 91, 107 S.Ct. 2254 (upholding prison policy prohibiting correspondence among inmates of different correctional institutions); *Thornburgh*, 490 U.S. at 419, 109 S.Ct. 1874 (upholding a regulation prohibiting inmates from receiving incoming publications deemed detrimental to prison security). Likewise, this Court has repeatedly found, "[w]ithout doubt, ... a valid, rational connection between the decision to impose a watch on [a prisoner's] mail and the desire to ensure the good order of the prison and the rehabilitation of prisoners by preventing [a prisoner] from engaging in illegal activities while incarcerated." *United States v. Workman*, 80 F.3d 688, 699 (2d Cir.1996) (quotation marks and citation omitted); *see also United States v.*

*Felipe,* 148 F.3d 101, 108 (2d Cir.1998); *Purnell,* 952 F.2d at 682–83.

▮ We now apply this heightened deference to the instant case. We find that defendants' actions were reasonably related to legitimate penological interests, and thus did not violate plaintiff's First Amendment rights as a matter of law. As set forth above, plaintiff had an extensive disciplinary history involving prohibited organizational activities, having been found guilty of several infractions between 1985 and 1994. Some of these involved dissemination of materials on behalf of the New African Liberation Movement, which called for the "uprootment of western imperialism," advocated "revolutionary actions against those that oppress or participate in the oppression of the Black community," and "recognize[d] no other authority than the authority of the revolution and the people." Moreover, we disagree with the district court's suggestion that a rational jury could view plaintiff's disciplinary history as too remote to justify defendants' action in May 1995; some of plaintiff's infractions had occurred as recently as 1994.

In light of these background facts, coupled with the paramount importance of exercising caution in matters of prison security, a rational jury could not find that defendants' decision to place a temporary watch on plaintiff's mail was not reasonably related to legitimate penological interests. It is true that the publication that sparked their decision to institute the mail watch was a harmless economics book. A title containing the phrase "Blood in the Streets," however, could arouse concern in any reasonable prison official. Even if, as the district court suggested, a jury could find that a more thorough examination of the book would have assuaged such con-

cerns, we find that it is generally sufficient for a prison official to base a security decision on the title alone. Considering the limited resources of prison systems and the intense pressure to prevent security problems, we cannot expect more of corrections personnel in most circumstances. Moreover, the actions taken by defendants were measured, limited to 30 days, and calculated to ensure that the apparently provocative materials were not an indication of a new security threat by an inmate with a history of advocating violence. Because we find that no rational jury could conclude otherwise, summary judgment for defendants on the merits is appropriate. And because we conclude that there was no violation of a clearly established right, defendants are entitled to qualified immunity.

▮ As for the district court's finding that questions of fact remain with respect to defendants' motivations for instituting the mail watch, we respectfully disagree. It has long been established that the qualified immunity standard of Harlow and its progeny is an objective one. *See Dobosz v. Walsh,* 892 F.2d 1135, 1140–41 (2d Cir. 1989). An official's subjective intent, motivation or belief is generally irrelevant. *See Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). To be sure, we have acknowledged that where the constitutional claim asserted contains a subjective component, a plaintiff may be able to avoid summary judgment on the qualified immunity issue based on the subjective motivations of the defendants. *Blue v. Koren,* 72 F.3d 1075, 1082–84 (2d Cir.1995). However, this requires a "particularized proffer of evidence of unconstitutional motive" sufficient to defeat the motion for summary judgment. *Id.* at 1084. Plaintiff has offered no such particularized evidence in this case.[1]

---

**1.** It is only to address the district court's

conclusion about subjective motivations that

In sum, we hold that no rational jury could find that defendants' decision to institute a temporary mail watch was not reasonably related to legitimate penological interests. There was no violation of plaintiff's First Amendment rights and, in any event, defendants are entitled to qualified immunity.

## CONCLUSION

The order of the district court denying defendants' motion for summary judgment is reversed. The case is remanded to the district court to dismiss the complaint.

we reach the qualified immunity issue at all. That is, once we decide that there is no constitutional violation, there typically is no need to address whether defendants are also protected by qualified immunity—although qualified immunity becomes obvious at that point. In this case, we take the further step of pronouncing the obvious—that qualified immunity exists—to avail defendants of the *Blue* standard to which they are entitled.