391 F.3d 106
 Shabaka SHAKUR, Plaintiff-Appellant,
v.
Donald SELSKY, Director of Special Housing, James Conway, First Deputy Superintendent of Attica, T. Sticht, Captain, R.T. Lomanto, Daniel Hurlburt, Correctional Officer, P. Foley, Correction Officer, Beyler, Correction Officer, R. Stack, Correction Officer, T. Steele, Correction Officer Dolan, Hearing Officer, Carol Edwards, Hearing Officer, sued in their individual and official capacities, Defendants-Appellees.
 Docket No. 03-0050.
 United States Court of Appeals, Second Circuit.
 Argued: May 26, 2004.
 Decided: December 6, 2004.
 
 COPYRIGHT MATERIAL OMITTED Gargi Pahuja, Keith Hovey (Jon Romberg, of counsel), Seton Hall University School of Law, Center for Social Justice, Newark, New Jersey, for Plaintiff-Appellant.
 Martin A. Hotvet, Assistant Solicitor General of the State of New York (Eliot Spitzer, Attorney General, on the brief, Daniel Smirlock, Deputy Solicitor General, of counsel), Albany, New York, for Amicus Curiae Eliot Spitzer, Attorney General of the State of New York.
 Before: SACK, SOTOMAYOR, and WESLEY, Circuit Judges.
 WESLEY, Circuit Judge.
 
 
 1
 This 42 U.S.C. § 1983 (Supp. I 2002) action involves a prisoner's claims of infringement of his free speech, free exercise, due process, and equal protection rights under the Constitution, and of his rights under the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. § 2000cc. The free speech, due process, and equal protection claims stem from confiscations of the prisoner's "New Afrikan political literature." The free exercise and RLUIPA claims arise from the alleged denial of the prisoner's opportunity to attend the Eid ul Fitr feast, a Muslim holiday. The prisoner filed his action pro se and, before defendants were served, the district court dismissed the complaint in its entirety with prejudice under 28 U.S.C. § 1915A (Supp. I 2002). We affirm the district court's dismissal of the due process and equal protection claims under § 1915A, but vacate the dismissal of the free speech and free exercise claims, as well as the RLUIPA claim.
 
 BACKGROUND
 
 2
 Plaintiff-appellant Shabaka Shakur filed a pro se complaint in the United States District Court for the Western District of New York. He was and remains in the custody of the New York State Department of Correctional Services (DOCS). Shakur appeals from the district court's dismissal of his complaint. The following are the "facts" as alleged in the complaint. See, e.g., Ortiz v. McBride, 380 F.3d 649, 651 (2d Cir.2004).
 
 1. The Christmas Eve Confiscation, 1999
 
 3
 In 1999, Shakur spent Christmas Eve in a Special Housing Unit (SHU) at Great Meadows Correctional Facility as the subject of a facility investigation. Defendant Hurlburt, a Great Meadows correctional officer, searched Shakur's property and discovered and then confiscated 26 books and pamphlets of "New Afrikan political literature," which he characterized as "Nubian gang materials." On Christmas Day, Shakur received an inmate misbehavior report charging him with possession of "gang material[s]" in violation of DOCS Institutional Rule of Conduct 105.12. Rule 105.12 provides that "[i]nmates shall not ... possess ... or use unauthorized organizational insignia or materials." N.Y. Comp.Codes. R. & Regs. tit. 7, § 270.2(B)(6)(iii) (2004). "An unauthorized organization," under Rule 105.12, "is any gang or any organization which has not been approved by the deputy commissioner for program services." Id.
 
 
 4
 Shakur was given a hearing by Defendant Dolan, a Great Meadows correctional officer, on the Rule 105.12 charge. Hurlburt testified that the confiscated materials were anti-establishment and anti-democracy; Shakur argued that they were simply political tracts and were not gang-related. Dolan found that the materials referred to a "revolutionary" organization "designed to create... and mobilize a well-armed war movement." He then determined that the organization was not authorized by DOCS and thus found Shakur guilty of a Rule 105.12 violation, imposing a penalty of 18 months in SHU. Shakur appealed the disposition to Defendant Selsky, the DOCS Director of Special Housing, who decreased the penalty to 12 months.
 
 
 5
 During his hearing, Shakur requested that Dolan forward the confiscated materials to Great Meadow's Facility Media Review Committee (FMRC), a committee that reviews inmate literature pursuant to established guidelines. N.Y. Comp.Codes. R. & Regs. tit. 7, §§ 712.2-712.3. New York regulations provide that "[i]t is departmental policy to encourage inmates to read publications from varied sources," id. § 712.1(a), but that "[w]hen there is a good faith belief that a publication ... in [the] possession of an inmate violates one or more of the media review guidelines, said publication shall be confiscated and referred to the FMRC for review and decision," id. § 712.3(b)(2). Neither Dolan nor Selsky referred Shakur's materials to the FMRC.
 
 2. The January 2, 2002 Confiscation
 
 6
 Two years later, on January 2, 2002, Defendant Foley, a correctional officer at the Attica Correctional Facility, searched Shakur.[1] He found and confiscated materials he characterized as a "New Afrikan Self Development Program." Shakur again requested that these materials be sent to the FMRC; Foley declined to do so. Instead, Foley filed a report charging Shakur with a second Rule 105.12 violation.
 
 
 7
 Defendant Lomanto, a Lieutenant, gave Shakur a hearing on this second Rule 105.12 charge, determined that Shakur's materials were "from a group that is not authorized," and found Shakur in violation of the rule, imposing a penalty of thirty days in keeplock. Shakur appealed the disposition on the grounds that Foley had failed to send the materials to the FMRC, that Rule 105.12 did not apply to his literature, and that Rule 105.12 was unconstitutionally vague. Defendant Conway, First Deputy Superintendent at Attica, found no error in the hearing. Shakur then filed an Article 78 petition. See N.Y. C.P.L.R. § 7801 (Consol.1994). The New York Supreme Court, Appellate Division, confirmed the DOCS determination and dismissed the petition. See Matter of Shakur v. Goord, 306 A.D.2d 958 (4th Dep't 2003).
 
 3. The Eid ul Fitr Feast, 2002
 
 8
 Shakur also contends that he was prevented from attending an important religious feast held at Attica on January 19, 2002. Shakur does not name the religious feast in his complaint, but on appeal claims that it was Eid ul Fitr. Shakur asserts that he was scheduled to attend but that Defendant Beyler, an Attica officer, prevented him from participating in the feast and from receiving a "required" meal. Shakur filed a grievance with the Inmate Grievance Resolution Committee and asked that "Beyler's malicious and intentional failure to perform his duties ... be reprimanded." The committee found that Beyler should have released Shakur for the event. Conway reversed that finding and the Central Officer Review Committee affirmed Conway's determination.
 
 
 9
 4. The Summer Confiscations and FMRC Review, 2002
 
 
 10
 In July, Defendant Stack, a correctional officer at Attica, searched Shakur's cell and confiscated 17 pages of additional "New Afrikan" materials that he characterized as "unauthorized gang materials." Shakur requested that the materials be sent to the FMRC and Stack refused. Stack charged Shakur with a third Rule 105.12 violation.
 
 
 11
 Defendant Sticht, a Captain at Attica, gave Shakur a hearing on this third Rule 105.12 charge. Shakur argued that the materials should be sent to the FMRC and requested that Stack appear as a witness. Sticht adjourned the hearing to review the materials and to secure Stack's appearance. Upon reconvening the hearing, Sticht found Shakur guilty of violating Rule 105.12. Sticht found that the "`New Afrikan Program' [literature] talks about ... overthrow[ing] and `liberat[ing]' parts of the U.S. for th[e] group's own country," and that the group was "not authorized by DOCS and is therefore an unauthorized group." Sticht imposed a penalty of 60 days in keeplock. Selsky affirmed the disposition.
 
 
 12
 In August, Foley again searched Shakur's property, found more "New Afrikan literature," and confiscated it. Foley ordered Shakur to destroy the literature, but Shakur refused and requested that it be sent to the FMRC. The Sergeant on Shakur's block granted the request. The FMRC reviewed these materials, found that three pages contained drawings that would "incite disobedience and violence," and approved the remainder of the literature. The materials were returned to Shakur with the objectionable portions redacted.
 
 5. Shakur's Complaint
 
 13
 Shakur filed a complaint in late November 2002. On the basis of the above factual recitation, Shakur alleged, inter alia, violations of (1) the Freedom of Speech Clause of the First Amendment; (2) the Due Process Clause of the Fourteenth Amendment; (3) the Equal Protection Clause of the Fourteenth Amendment; and (4) both the Free Exercise Clause of the First Amendment and RLUIPA. Shakur's complaint contained other claims not the subject of this appeal. The district court dismissed Shakur's complaint with prejudice sua sponte pursuant to 28 U.S.C. §§ 1915A before the service of process on any defendant. The district court explained the reasons for its dismissal in an opinion dated December 10, 2002.
 
 
 14
 The district court first considered Shakur's claim that defendants violated what Shakur characterized as his rights "to freedom of political expression" and "to hold and express political beliefs." Shakur alleged that defendants violated these rights by improperly confiscating his "New Afrikan political literature." The district court disagreed. It noted that "[t]he New African organization, also known as the New African Liberation Movement (NALM), is a group which has been identified as an unauthorized organization by ... [DOCS], and this identification by DOCS has been upheld in federal court as reasonably related to legitimate penological objectives." Citing Duamutef v. Moran, 1998 WL 166838 (N.D.N.Y. Apr.7, 1998) (Pooler, J.) (Duamutef I) and Duamutef v. Hollins, 297 F.3d 108 (2d Cir.2002) (Duamutef II), the court held that "it has already been settled that the limitations imposed in the New York State prison system on written materials related to the New African Liberation Movement comport with First Amendment requirements."
 
 
 15
 The district court then considered Shakur's claim that defendants denied him due process. The court held that "[t]o the extent the claim is that the materials should have be [sic] reviewed by the FMRC, the claim fails because DOCS had already determined that the New African organization is not authorized, and thus the possession of any written materials related to it are, a priori, a violation of prison rules." The court held further that "[t]o the extent that ... plaintiff [claims to have] been deprived of written materials in which he has [a] property interest," such a deprivation "was not without due process of law because New York provides an adequate post-deprivation remedy" in the form of an Article 78 proceeding.
 
 
 16
 The district court also examined Shakur's equal protection claim. Shakur alleged that defendants "in subjecting plaintiff to continuous searches, confiscations and punishment in clear disregard to plaintiffs [sic] constitutional rights evidence a pattern of political and racial discrimination in violation of the Equal Protection clause of the 14th amendment." The district court found that Shakur failed to allege either "that other inmates who possessed materials related to an unauthorized organization were treated differently" than he or that defendants had disciplined him "based on impermissible considerations." The court thus found no ground for an equal protection claim.
 
 
 17
 Finally, the district court considered Shakur's claim that Beyler violated Shakur's right "to freely exercise his religious belief" by preventing him from attending the January 19 religious feast that Shakur now contends was Eid ul Fitr. The district court cited Ford v. McGinnis, 230 F.Supp.2d 338 (S.D.N.Y.2002), for the proposition that "a denial of a single religious meal is a de minimis burden on the free exercise of religions and, as such, is not of constitutional dimension." The court likewise concluded that the fact that Shakur missed "a single religious feast simply does not amount to a `substantial burden' on his religious exercise" under RLUIPA. Accordingly, the court concluded that Shakur failed to state a claim for a violation of either the Free Exercise Clause of the First Amendment or RLUIPA.
 
 
 18
 The district court entered an order dismissing Shakur's complaint with prejudice. Shakur filed a notice of appeal and moved for in forma pauperis status. This Court granted Shakur's motion and assigned pro bono counsel.[2] The Office of the Attorney General of the State of the New York submitted a brief as amicus curiae.
 
 DISCUSSION
 
 19
 We review the district court's § 1915A dismissal of Shakur's complaint de novo. See Liner v. Goord, 196 F.3d 132, 134 (2d Cir.1999). Section 1915A provides:
 
 
 20
 § 1915A. Screening
 
 
 21
 (a) SCREENING. — The court shall review, before docketing, if feasible or, in any event, as soon as practicable after docketing, a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity.
 
 
 22
 (b) GROUNDS FOR DISMISSAL. — On review, the court shall identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint —
 
 
 23
 (1) is frivolous, malicious, or fails to state a claim upon which relief may be granted....
 
 
 24
 28 U.S.C. § 1915A(a)-(b).
 
 
 25
 The court also cited 28 U.S.C. § 1915(e)(2)(B)(ii) as a statutory predicate for its dismissal of the complaint. Section 1915 governs proceedings in forma pauperis, while § 1915A "appl[ies] to all civil complaints brought by prisoners against governmental officials or entities regardless of whether the prisoner has paid [a] filing fee." Carr v. Dvorin, 171 F.3d 115, 116 (2d Cir.1999) (per curiam). Sections 1915 and 1915A recite identical grounds for dismissal, compare 28 U.S.C. § 1915A(b)(1) with 28 U.S.C. § 1915(e)(2)(B)(i)-(ii), and we have found both sections applicable to prisoner proceedings in forma pauperis, see, e.g., Giano v. Goord, 250 F.3d 146, 149-50 (2d Cir.2001) (applying § 1915); Carr, 171 F.3d at 116 (applying § 1915A); McEachin v. McGuinnis, 357 F.3d 197, 198 (2d Cir.2004) (applying both).
 
 
 26
 We limit our review here to § 1915A. The Supreme Court has held that the pre-1996 version of § 1915 did not permit dismissals with prejudice, see Denton v. Hernandez, 504 U.S. 25, 34, 112 S.Ct. 1728, 118 L.Ed.2d 340 (1992), and the Fourth and Seventh Circuits have applied that rule to the present § 1915, see Nagy v. Butner, 376 F.3d 252, 258 (4th Cir.2004); see also Gladney v. Pendleton Corr. Facility, 302 F.3d 773, 775 (7th Cir.2002). We see no need to resolve that question at this time as § 1915A permits dismissals with prejudice. Although the Supreme Court has not commented on § 1915A in this regard, both the Seventh and D.C. Circuits agree that § 1915A authorizes dismissals with prejudice. See Gladney, 302 F.3d at 775; Davis v. District of Columbia, 158 F.3d 1342, 1349 (D.C.Cir.1998). We have already tacitly held as much, see Liner, 196 F.3d at 133-35, and now abide by that precedent.
 
 
 27
 No portion of a complaint stating "a claim upon which relief may be granted" should be dismissed by the screening mechanism of § 1915A. This ground — legal sufficiency — "authorizes a court to dismiss a claim on the basis of a dispositive issue of law." Neitzke v. Williams, 490 U.S. 319, 326, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989) (discussing standard of Federal Rule of Civil Procedure 12(b)(6)). It operates "without regard to whether [a claim] is based on an outlandish legal theory or on a close but ultimately unavailing one." Id. at 327, 109 S.Ct. 1827. "The settled rule is that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." McEachin, 357 F.3d at 200 (citations and internal quotation marks omitted). In assessing whether a claim is legally sufficient, "we accept all of the facts alleged in the complaint as true and draw all inferences in the plaintiff's favor." Larkin v. Savage, 318 F.3d 138, 139 (2d Cir.2003) (per curiam). "Further, when the plaintiff proceeds pro se, as in this case, a court is obliged to construe his pleadings liberally, particularly when they allege civil rights violations." McEachin, 357 F.3d at 200. Liberally construing Shakur's complaint, we find his free expression, free exercise, and RLUIPA claims to be legally sufficient, and vacate the district court's dismissal with regard to those claims.
 
 
 28
 However, we find that Shakur's due process allegations fail to state a claim on which relief may be granted.[3] Moreover, we find them frivolous. A claim "is frivolous where it lacks an arguable basis either in law or in fact." Neitzke, 490 U.S. at 325, 109 S.Ct. 1827. Section 1915A "does not require that process be served or that the plaintiff be provided an opportunity to respond before [the] dismissal" of a frivolous claim. Carr, 171 F.3d at 116. Accordingly, we affirm the district court's sua sponte dismissal with regard to Shakur's due process claim.
 
 1. The Freedom of Speech Claim
 
 29
 Shakur's first claim is that the defendants violated his constitutional right to free expression. Reading Shakur's complaint liberally, we find the complaint alleges (1) that Rule 105.12 is unconstitutional, and (2) in the alternative, that Rule 105.12 did not authorize defendants' confiscations, and, accordingly, that such confiscations were improperly made for reasons of personal prejudice as opposed to legitimate penological interests. We hold that Shakur states a legally sufficient First Amendment claim.
 
 
 30
 "A prison inmate ... retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." Giano v. Senkowski, 54 F.3d 1050, 1053 (2d Cir.1995) (Senkowski). "The governing standard is one of reasonableness...." Benjamin v. Coughlin, 905 F.2d 571, 574 (2d Cir.1990). "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). "The prisoner-plaintiff bears the burden of proving that [a] disputed regulation is unreasonable." Senkowski, 54 F.3d at 1054.
 
 
 31
 The reasonableness of a prison regulation is measured by the three-step analysis outlined by the Supreme Court in Turner, 483 U.S. at 89-91, 107 S.Ct. 2729. See Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir.1995). First, we ask "whether the governmental objective underlying the regulations at issue is legitimate and neutral, and [whether] the regulations are rationally related to that objective." Thornburgh v. Abbott, 490 U.S. 401, 414, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989). Second, we look to see "whether there are alternative means of exercising the right that remain open to prison inmates." Id. at 417, 109 S.Ct. 1874 (citations and internal quotation marks omitted). Third, we examine "the impact that accommodation of the asserted constitutional right will have on others (guards and inmates) in the prison." Id. at 418, 109 S.Ct. 1874.
 
 
 32
 "The first Turner factor is multifold." Id. at 414, 109 S.Ct. 1874. A governmental objective must be "legitimate" and "neutral." Id. Conduct expressly aimed at protecting prison security is "legitimate" beyond question and is in fact "central to all other correctional goals." Id. at 415, 109 S.Ct. 1874 (quoting Pell v. Procunier, 417 U.S. 817, 823, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1973)). As for neutrality, "[w]here ... prison administrators draw distinctions between publications solely on the basis of their potential implications for prison security, the regulations are `neutral' in the technical sense...." Id. at 415-16, 109 S.Ct. 1874. However, where "regulations fairly invite[ ] prison officials and employees to apply their own personal prejudices and opinions as standards for prisoner... censorship," they are "decidedly not `neutral' in the relevant sense." Id. at 416 n. 14, 109 S.Ct. 1874 (citations and internal quotation marks omitted).
 
 
 33
 A legitimate and neutral governmental objective must be rationally related to a challenged course of action. Id. at 414, 109 S.Ct. 1874. "Where the regulations at issue concern... [publications in] prison, ... a regulation which gives prison authorities broad discretion is appropriate." Id. at 416, 109 S.Ct. 1874. It is rational to censor any materials found "to create an intolerable risk of disorder under the conditions of a particular prison at a particular time." Id. at 417, 109 S.Ct. 1874. The Supreme Court has permitted censorship of such materials where the censorship occurred via "individualized" review. See id.
 
 
 34
 The second Turner prong cautions that, when other avenues for exercising an asserted right remain available, "courts should defer to the informed discretion of prison officials to gauge the validity of the regulation." Senkowski, 54 F.3d at 1056. The "right" in question must be viewed "sensibly and expansively," Thornburgh, 490 U.S. at 417, 109 S.Ct. 1874, to "allow for flexibility in determining what qualifies as another means of expression," Senkowski, 54 F.3d at 1055. As far as the regulation of free expression is concerned, a regulation cannot "deprive prisoners of all means of expression," Turner, 482 U.S. at 92, 107 S.Ct. 2254, and must leave "effective" means for "substitutable" exercises of expression, see Allen, 64 F.3d at 80. But, generally, if a regulation "permit[s] a broad range of publications to be ... read, this factor is clearly satisfied." Thornburgh, 490 U.S. at 418, 109 S.Ct. 1874.
 
 
 35
 Under the third and final Turner factor, the Supreme Court has instructed that, "[w]here ... the right in question can be exercised only at the cost of significantly less liberty and safety for everyone else, guards and other prisoners alike, the courts should defer to the informed discretion of corrections officials." Id. at 418, 109 S.Ct. 1874 (internal citations and quotation marks omitted). However, "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable." Turner, 482 U.S. at 90, 107 S.Ct. 2254. While "there is no requirement that prison officials adopt the least restrictive alternative to their preferred policy," Senkowski, 54 F.3d at 1056, "if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard," Turner, 482 U.S. at 91, 107 S.Ct. 2254. "The degree to which the cost of [an alternative] is burdensome is an issue of fact...." Allen, 64 F.3d at 81.
 
 
 36
 Shakur has stated a legally sufficient claim that defendants' confiscation of his New Afrikan political literature violated the First Amendment. The complaint in this case is akin to the complaint in Thomas v. Scully, 943 F.2d 259 (2d Cir.1991) (per curiam). In Thomas, the plaintiff challenged a prison's confiscation of nude photographs of his girlfriend. Id. at 260. This Court later upheld similar confiscations in Senkowski, 54 F.3d at 1057, as reasonable under Turner. However, in Thomas, we concluded that, "whatever its merit, the complaint did state a claim on which relief could be granted." 943 F.2d at 260. The distinction between Thomas and Senkowski is that Senkowski came to us on summary judgment rather than on a dismissal for failure to state a legally sufficient claim. At the point of summary judgment, plaintiff had been able to assemble evidence to attempt to meet his burden of proof, see Senkowski, 54 F.3d at 1054, and defendants had been able to articulate rationales for the policy, see id. at 1054-55. This Court could thus "find the government's explanation ... valid and rational," see id. at 1055, and hold that the plaintiff could not meet his burden of proof, see id. at 1054. The holding of Thomas, by contrast, indicates that we would not reach such a conclusion on "the face of the complaint" alone.[4] Thomas, 943 F.2d at 260. Likewise, although we are unable now to determine whether the challenged conduct is reasonable or not, we hold that Shakur has stated a claim on which relief may be granted.
 
 
 37
 Defendants predicated their confiscations on Rule 105.12. That rule distinguishes between authorized and unauthorized organizations. N.Y. Comp.Codes. R. & Regs. tit. 7, § 270.2(B)(6)(iii). "An unauthorized organization is any gang or any organization which has not been approved by the deputy commissioner for program services." Id. Rule 105.12 prohibits the possession of "unauthorized organizational insignia or materials." Id. Defendants classified Shakur's New Afrikan political literature as unauthorized organizational materials.
 
 
 38
 On its face, Rule 105.12 appears to ban all literature from outside organizations, unless those organizations have been approved by the deputy commissioner. This regulation would sweep more broadly than the regulations upheld in Turner, Thornbugh, Senkowski, and Allen. An across-the-board exclusion of materials of "unauthorized organizations" may not be rationally related to any governmental objective. Assuming that Rule 105.12 is targeted at the legitimate goal of securing prisons, we are not sure how a complete ban on the materials of "unauthorized organizations" is rationally related to that goal. The district court articulated no such relationship, and none appears to us on the face of the regulation.
 
 
 39
 Moreover, Supreme Court precedent suggests that Rule 105.12 may be too broad to meet the Turner standard. In Thornburgh, the Supreme Court upheld the facial validity of a prison regulation permitting the warden to reject publications pursuant to articulated standards. 490 U.S. at 404, 405 n. 5, 109 S.Ct. 1874. The Court noted that it was "comforted by the individualized nature of the determinations required by the regulation," and that the regulations "expressly reject[ed] certain shortcuts that would lead to needless exclusions." Id. at 416-17, 109 S.Ct. 1874 (emphases added). Rule 105.12, by contrast, does not provide any standard against which DOCS officials will conduct an individualized review of the publication in question.
 
 
 40
 Indeed, the "needless exclusions" apparently made possible by Rule 105.12 exceed even the exclusions that the Supreme Court suggested would be unconstitutional in Thornburgh. In Thornburgh, the Supreme Court cited with approval a regulation prohibiting the establishment of an excluded list of subscription publications, suggesting that the "shortcut" of listing banned publications would lead to "needless exclusions." Id. at 417, 109 S.Ct. 1874. The shortcut in Thornburgh would, by default, subject the universe of publications to individualized review, and ban only a discrete set of enumerated publications. Rule 105.12 appears to take a much more serious shortcut. It seems to ban all the publications of unlisted organizations and allow only a discrete set of enumerated organizational materials. This "shortcut" greatly circumscribes the universe of reading materials accessible to inmates. It thus appears that Rule 105.12's ban is not sufficiently related to any legitimate and neutral penological objective.
 
 
 41
 The second prong of Turner may also support Shakur. At this point, we do not know what alternative avenues exist by which Shakur might exercise his right to free expression. Defendants were never served in this case and, consequently, have not been asked to explain the range of materials available to Shakur. Nor do we know how Rule 105.12 has been applied: we do not know how many materials are considered to be "organizational materials," how many organizations are "authorized," or how difficult it is to obtain such authorization. Thus, we cannot say that this prong weighs in favor of dismissal.
 
 
 42
 Most clearly, the third Turner prong supports Shakur's argument. There is an obvious alternative in this case. As Shakur has continually pointed out, DOCS has established an FMRC in every correctional institution. The purpose of the FMRC is to review inmates' reading materials. Shakur thus points to evidence that DOCS might be able to accommodate Shakur's rights "at de minimis cost to valid penological interests." Turner, 482 U.S. at 91, 107 S.Ct. 2254. Indeed, his final confiscation was subjected to FMRC review, with no obvious harm to penological interests. While we recognize that forcing an individualized FMRC review of materials might put a strain on prison resources, Allen counsels that the nature of those costs is an issue of fact. See Allen, 64 F.3d at 81. In the absence of a determination that the costs are prohibitive — a claim that is somewhat unlikely given that FMRC review procedures are already in place — this third prong weighs in Shakur's favor. Thus, with regard to the constitutionality of Rule 105.12, the present complaint cannot be dismissed on its face because none of the Turner factors facially favor DOCS. Id.
 
 
 43
 Shakur also states a legally cognizable claim if we assume that Rule 105.12 did not authorize the challenged confiscations. The first Turner factor requires a "neutral" objective, and the Supreme Court has distinguished actions pursuant to neutral objectives from actions pursuant to "personal prejudices." See Thornburgh, 490 U.S. at 416 n. 14, 109 S.Ct. 1874. Shakur alleges that his Rule 105.12 punishment was "arbitrary and unjustifiable." We understand Shakur's complaint therefore to allege, as he now argues, that the confiscations were made for reasons of "personal prejudice."
 
 
 44
 Our precedent indicates that a failure to abide by established procedures or standards can evince an improper objective. In Abdul Wali v. Coughlin, 754 F.2d 1015 (2d Cir.1985), this Court held that a prison official's failure to adhere to established procedures was evidence that he was not acting pursuant to a proper penological objective:
 
 
 45
 [The prison official] did not apply the guidelines set forth [in DOCS directives] .... [O]ur review ... might have been very different had it been reached by reference to those standards. The DOCS guidelines provide corrections officials great leeway in determining what literature will be permitted into prison facilities, yet assure that each decision represents the consensus of a number of penological professionals, rather than the bias or animosity of a particular official.... [A] decision reached by reference to the[ ] substantive and procedural guidelines [of the DOCS directives] will be afforded great deference by a reviewing court. Where a corrections official chooses to ignore established standards and procedures, however, he must be prepared to demonstrate that his decision — reached in consultation with no one, and made in reliance on no more than his personal beliefs — is supported by reasonable justification.
 
 
 46
 Id. at 1036. Although Abdul Wali pre-dates the Supreme Court's establishment of its current "reasonableness" test, see Turner, 482 U.S. at 101 n. 1, 107 S.Ct. 2254 (Stevens, J., concurring in part and dissenting in part), the evidentiary point of Abdul Wali remains applicable.
 
 
 47
 In the absence of Rule 105.12, the challenged confiscations would have been subject to FMRC review. See N.Y. Comp.Codes. R. & Regs. tit. 7, §§ 712.2-712.3. Under Abdul Wali, defendants' decision to bypass FMRC review suggests that their confiscations were not made pursuant to legitimate and neutral penological objectives. This conclusion is buttressed by the fact that an eventual FMRC review of Shakur's materials — in the single instance where FMRC review occurred — ended in approval of the vast majority of those materials. We thus hold that, if Rule 105.12 did not authorize defendants' confiscations, Shakur's complaint states a legally sufficient claim of unconstitutional infringement of his First Amendment right to free expression.
 
 
 48
 For these reasons, we find that Shakur's claim that the confiscations at issue were unconstitutional is a claim on which relief could be granted. Although the district court properly cited Turner, Thornburgh, and Allen as controlling precedent, it ultimately based its dismissal on Duamutef II and Duamutef I, and neither case is apposite. The district court cited the Duamutef cases for the proposition that "it has already been settled that the limitations imposed in the New York State prison system on written materials related to the New African Liberation Movement comport with First Amendment requirements." Duamutef II and Duamutef I do not support that proposition. Moreover, the complaint only alleges that defendants seized "New Afrikan political literature," not "materials related to the New African Liberation Movement."
 
 
 49
 In Duamutef II, this Court considered allegedly arbitrary mail censorship. See Duamutef II, 297 F.3d at 110-11. The plaintiff alleged that the defendants had violated the First Amendment by instituting a "mail watch," "stopping, opening and reading all non-privileged correspondence." Id. This Court upheld the mail watch as reasonably related to legitimate penological interests. We noted that the plaintiff "had an extensive disciplinary history involving prohibited organizational activities," id. at 113, and had recently been disciplined for "deliberately misaddress[ing] mail containing correspondence advocating violent overthrow of the government," id. at 110. The misaddressed correspondence included NALM materials. See id. at 110. The case, however, did not involve the confiscation of NALM materials. See id. at 110. Indeed, the incident triggering the mail watch was the prisoner's receipt of James Dale Davidson and Sir William Rees Magg's economics book "Blood in the Streets: Investment Profits in a World Gone Mad." Id. at 111. We had no reason to consider the constitutionality of a ban on unauthorized materials generally or on New Afrikan political literature in particular. See id. at 110, 113. Thus, our holding in Duamutef II does not reach Shakur's claims.
 
 
 50
 Duamutef I is as unavailing as Duamutef II. Moreover, Duamutef I, of course, is not binding. In Duamutef I, the district court considered the confiscation of certain NALM materials. 1998 WL 166838, at *1. Unlike the district court here, the district court in Duamutef I reviewed all of those materials. Id. at *2. The Duamutef I court concluded that seizure of those particular materials "furthered the legitimate goal of maintaining prison security." Id. at *2. The court adopted a magistrate judge's opinion which assumed, arguendo, that NALM was a "nonviolent," "legitimate peaceful political movement" that constituted "an acceptable political organization under prison rules." Id. at * 3-4. The court did not consider any NALM materials beyond those before it. It certainly did not consider Shakur's seized New Afrikan political literature or a ban on unauthorized materials generally. Consequently, neither Duamutef II or Duamutef I disposes of Shakur's claim. We hold that the district court erred in disposing of Shakur's free expression claim. We therefore vacate the district court's dismissal of that claim.
 
 2. The Procedural Due Process Claim
 
 51
 The district court relied on the Duamutef cases in dismissing Shakur's procedural due process claim. Although we disagree with this analysis for the reasons stated above, we affirm the district court's dismissal.
 
 
 52
 Shakur presents no colorable due process argument. A procedural due process analysis proceeds with two questions. "[T]he first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." Kentucky Dep't of Corrs. v. Thompson, 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989) (citations omitted). There are two possible sets of deprivations in this case. The first consists of the punishments imposed on Shakur, which included a penalty of 12 months in SHU. The second consists of Shakur's deprivation of his literature, as his literature constituted a property interest, see, e.g., Parratt v. Taylor, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), overruled in part on other grounds by Daniels v. Williams, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), and, according to Shakur, a First Amendment liberty interest. Neither deprivation occurred without due process.
 
 
 53
 Shakur objects only to the defendants' failure to invoke FMRC review. He concedes that "the prison may, consistent with the Due Process clause ... immediately seize any publication that is suspected as potentially posing a threat to institutional security," and he therefore "does not object to the immediate seizure of his political material." Instead, he contests what he terms "the entirely inadequate subsequent final process." The only procedural protection that Shakur identifies as missing from that process is an FMRC review. Shakur does not challenge this Court's holding that the ordinary disciplinary procedures of the New York State prison system comport with the appropriate due process standards outlined in Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). See Walker v. Bates, 23 F.3d 652, 656 (2d Cir.1994).
 
 
 54
 Shakur's allegation that defendants deviated from FMRC procedures is unavailing. We confronted an analogous question in Holcomb v. Lykens, 337 F.3d 217 (2d Cir.2003). In Holcomb, the plaintiff "assert[ed] that he was deprived of his Fourteenth Amendment procedural due process rights when Vermont state corrections officers revoked his extended furlough without following the procedures" required by state law.[5] Id. at 220. Holcomb brought a § 1983 action, claiming that defendants' failure to follow mandatory procedures denied him due process. Id. at 224. This Court affirmed the district court's grant of summary judgment to the Vermont officers. Id. at 220, 224-25. We explained that the only relevant inquiry was whether the constitutional "minimal procedure[s] for revocation of parole" were met, not whether state procedures were followed:
 
 
 55
 Although for purposes of his state habeas petition the question was whether Holcomb received an appropriate sanction under state law, for purposes of his federal procedural due process claim the question is whether he received the procedural protection mandated by the federal Constitution.
 
 
 56
 Id. at 224 (emphasis in original). Likewise, here, regardless of state procedural guarantees, the only process due an inmate is that minimal process guaranteed by the Constitution, as outlined in Wolff, 418 U.S. at 561-70, 94 S.Ct. 2963. "[S]tate statutes do not create federally protected due process entitlements to specific state-mandated procedures." Holcomb, 337 F.3d at 224.
 
 
 57
 Shakur argues that defendants' conduct varied egregiously from established guidelines, citing Tellier v. Fields, 280 F.3d 69 (2d Cir.2000), for the proposition that "[t]his Court has held that a glaring variation from [prison] regulations violates Due Process." Shakur misreads Tellier. In Tellier, the plaintiff was placed in SHU without a hearing. See Tellier, 280 F.3d at 75. There was no question that the protections outlined in Wolff were withheld. "The [officer] never told him why he was in SHU and denied him the opportunity to present evidence or be heard." Id. The only question was whether Tellier had a liberty interest in being free from the SHU confinement he served. See id. at 79-83. It was in this context that the Court examined the applicable prison regulations. Tellier did not re-examine Wolff. The Wolff standards guide the due process analysis here. Under those standards, Shakur received due process, as he concedes.
 
 
 58
 Thus, we find that Shakur fails to present a colorable due process claim and we affirm the district court's dismissal of that claim.
 
 3. The Equal Protection Claim
 
 59
 The district court also dismissed Shakur's equal protection claim. The court explained that Shakur alleged neither that "other inmates who possessed materials related to an unauthorized organization were treated differently" nor that he had been disciplined on any "impermissible considerations." Shakur does not raise the equal protection claim on appeal. "It is well established that an argument not raised on appeal is deemed abandoned and lost, and that a court of appeals will not consider the argument unless it has reason to believe that manifest injustice would result otherwise." United States v. Joyner, 313 F.3d 40, 44 (2d Cir.2002) (citations and internal quotation marks omitted). We therefore affirm the district court's dismissal of Shakur's equal protection claim.
 
 4. The Free Exercise & RIULPA Claims
 
 60
 Finally, Shakur alleges that defendants' refusal to allow him to attend a "religious feast" violated his First Amendment right to the free exercise of his religion and constituted a violation of RLUIPA. The district court dismissed both of these claims. Shakur and the amicus contend that the district court erred in its analysis. We agree.
 
 
 61
 The district court adopted the reasoning of Ford, 230 F.Supp.2d at 347-48. In Ford, the district court found, inter alia, that denying an inmate the Eid ul Fitr feast was merely a de minimis — and not a "substantial" — burden, and therefore was not cognizable under our free exercise jurisprudence. Id. at 348 n. 10. The district court in this case simply applied Ford to Shakur's First Amendment free exercise and RLUIPA claims.[6] It held that "[p]laintiff's missing of a single religious feast simply does not amount to a `substantial burden' on his religious exercise."
 
 
 62
 Ford has subsequently been overruled by this Court. See Ford v. McGinnis, 352 F.3d 582 (2d Cir.2003). In reversing the district court's Ford opinion, we applied the substantial burden test to Ford's free exercise claim as Ford had not challenged that standard. "Given that fact, and because we did not benefit from the parties' briefing on the issue, we ... proceed [ed] ... on the assumption that the substantial burden test applies." Id. at 592. We explained that Eid ul Fitr "is one of two major religious observances in Islam." Id. at 584-85. We then stated that we "would be inclined to hold ... that Ford has established a substantial burden as a matter of law." Id. at 594. Only "[t]he absence of a cross-motion for summary judgment by plaintiff and the semblance of a disputed factual issue ... prevent [ed] us from holding that plaintiff [was] entitled to summary judgment." Id.
 
 
 63
 Our decision in Ford is controlling here. Under Ford, Shakur states free exercise and RLUIPA claims. Accordingly, we vacate the district court's dismissal of those claims.
 
 CONCLUSION
 
 64
 The district court's order of December 12, 2002 dismissing plaintiff-appellant's complaint with prejudice is hereby affirmed with regard to the procedural due process and equal protection claims, and vacated and remanded for further proceedings with regard to the First Amendment free speech and free exercise claims and the RLUIPA claim.
 
 
 
 Notes:
 
 
 [1]
 DOCS transferred Shakur to Attica in October 2000
 
 
 [2]
 We ordered that assigned counsel brief both Shakur's appeal and the appeal inIsh Yerushalayim v. United States Dep't of Corr., 374 F.3d 89 (2d Cir.2004) (per curiam), as the appeals involved substantially similar questions.
 
 
 [3]
 Shakur waived his equal protection claim on appealSee infra Part 3.
 
 
 [4]
 "Admittedly, there are regulations so obviously related to legitimate penological concerns that challenges to them may be dismissed ... based simply on an (irrefutable) `common sense determination.'"Senkowski, 54 F.3d at 1059 (Calabresi, J., dissenting). Common sense does not provide us with an irrefutable determination here.
 
 
 [5]
 Applicable state regulations define "extended furlough" as "approved absence from a facility for 15 or more consecutive days and nights."Id. at 218 n. 1.
 
 
 [6]
 RLUIPA provides,inter alia, that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution...." 42 U.S.C. § 2000cc-1(a).