# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 03-2431

ANTHONY KING,

*Plaintiff-Appellant*,

v.

FEDERAL BUREAU OF PRISONS
and CHARLES GILKEY,

*Defendants-Appellees*.

_____

Appeal from the United States District Court
for the Southern District of Illinois.
No. 02-596-JPG—J. **Phil Gilbert**, *Judge*.

_____

ARGUED JUNE 15, 2005—DECIDED JULY 13, 2005

_____

Before POSNER, COFFEY, and KANNE, *Circuit Judges*.

POSNER, *Circuit Judge*. Anthony King, an inmate at a federal prison in Illinois, brought this suit for damages against both the prison's warden and the Bureau of Prisons, claiming that they had violated his federal constitutional rights by forbidding him to telephone his stockbroker and to buy a book on computer programming. The district judge, pursuant to 28 U.S.C. § 1915A(a), which requires

district judges to screen prisoner suits for merit as soon as they are filed, dismissed the suit as frivolous. § 1915A(b). The joinder of the Bureau of Prisons was indeed frivolous. Although *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971), authorizes the filing of constitutional tort suits against federal officers in much the same way that 42 U.S.C. § 1983 authorizes such suits against state officers, it does not permit suit against the federal agency itself. *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 69-70 (2001); *FDIC v. Meyer*, 510 U.S. 471, 484-86 (1994).

King, who is in prison because he was convicted in 1999 of selling a defaced firearm, 18 U.S.C. §§ 922(f), (k), and possessing or using an explosive during the commission of a felony, 18 U.S.C. § 844(h), and was sentenced to 130 months in prison, is the lawful owner of some stocks that he wanted to instruct his broker to sell if their prices fell below speci- fied levels. The prison says he's forbidden to telephone his broker. A regulation of the Bureau of Prisons allows prison- ers to submit a list of thirty telephone numbers that they want to call; should the list include phone numbers of people who aren't members of the prisoner's family, the prison offers them an opportunity to have their numbers removed from the list. 28 C.F.R. § 540.101(a)(2). The prison may also remove a number from the list if it determines that allowing the prisoner to call the number would endanger the welfare of the prison or the public, and the regulation specifies a procedure that the associate warden must follow in order to do this. 28 C.F.R. § 540.101(a)(3). Apparently the procedure was not followed in this case; King was allowed to make one call to his stockbroker and then issued a disciplinary citation for misusing his telephone privileges, which has discouraged him from repeating the attempt.

The government argues that calling a stockbroker is improper because a prisoner is not allowed to conduct a

business. Indeed he is not, 28 C.F.R. § 541.13, Table 3, Offense No. 408, and this is a permissible restriction on prisoners' residual freedom. *French v. Butterworth*, 614 F.2d 23 (1st Cir. 1980); *Garland v. Polley*, 594 F.2d 1220 (8th Cir. 1979); *Stringer v. De Robertis*, 541 F. Supp. 605, 607 (N.D. III. 1982), aff'd without opinion, 738 F.2d 442 (7th Cir. 1984). But it cannot justify the prison's policy, for the prison denies that it has tried to prevent King from communicating by mail the same information that, communicated by telephone, the prison calls the conduct of business.

Anyway, unless one is engaged in a financial business, ordering one's broker to sell stock (whether immediately or, as here, contingent on a price change) is no more the conduct of a business than asking a real estate broker to sell one's house is. Securities are owned by millions of people who are not engaged in the securities business. The "no business" regulation goes on to provide that "this [prohibition] does not, however, prohibit correspondence necessary to enable an inmate to protect property and funds that were legitimately the inmate's at the time of commitment." Thus "an inmate may correspond about refinancing an existing mortgage or sign insurance papers, but may not operate a mortgage or insurance business while in the institution." 28 C.F.R. § 540.14(d)(4). The references to "correspondence" and "correspond" might be thought to exclude the use of the phone, but such an inference would be inconsistent with the phone regulation itself, which does not suggest that telephone privileges can be withheld for reasons unrelated to the welfare of the prison or the public. There could be security or other concerns presented by the use of the telephone that would justify requiring a prisoner to use the mails instead, but the government has not as yet pointed to any.

Yet even if the prison is acting arbitrarily, which so far as appears it is, King has no constitutional claim unless the

prison's action has deprived him of a constitutional right. He argues that not letting him talk to his broker on the phone infringes freedom of speech, but that is absurd; an order to sell, like a threat intended to intimidate, *Virginia v. Black*, 538 U.S. 343 (2003); *United States v. Velasquez*, 772 F.2d 1348, 1357-58 (7th Cir. 1985); *United States v. Cassel*, 408 F.3d 622, 633-34 (9th Cir. 2005), is not the kind of verbal act that the First Amendment protects. See *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 455-56 (1978); *National Organization for Women v. Operation Rescue*, 37 F.3d 646, 655-56 (D.C. Cir. 1994); *United States v. Rowlee*, 899 F.2d 1275, 1278 (2d Cir. 1990); cf. *International Brotherhood of Electrical Workers, Local 501 v. NLRB*, 181 F.2d 34, 40 (2d Cir. 1950) (L. Hand, J.). It has no connection to the marketplace of ideas and opinions, whether political, scientific, aesthetic, or even commercial.

King also argues, however, that by preventing prompt communication with his broker the prison is depriving him of his property. Suppose he learned that termites were eating away at his house and that serious damage could be avoided only if he were permitted to telephone an exterminator, and the prison refused for no reason to allow him to make the call. The reduction in the value of the house as a result of the termite damage that the call would have prevented would be a deprivation of property, *Pro-Eco, Inc. v. Board of Commissioners*, 57 F.3d 505, 512-13 (7th Cir. 1995); *Soldal v. Cook County*, 923 F.2d 1241, 1245-46 (7th Cir. 1991), reversed on other grounds, 506 U.S. 56 (1992); *Executive 100, Inc. v. Martin County*, 922 F.2d 1536, 1541 (11th Cir. 1991); *River Vale Township v. Town of Orangetown*, 403 F.2d 684, 685 (2d Cir. 1968), and being arbitrary would be a denial of due process of law.

The case at hand is not precisely analogous. King wanted to be able to sell some of his stocks promptly if their price

fell, lest the price continue falling. But when one says that the price of a stock is falling, what one really means is that it has *been* falling and one expects it to continue doing so. The expectation is speculative and often mistaken. If the price of a stock fell 5 percent one day, and the market expected it to fall another 10 percent by the end of the week, an effort to sell before the price dropped would probably be futile—no one expecting the price to be 10 percent lower by the end of the week would pay a higher price today. Nevertheless, to deprive a person of the power to respond to changing market conditions by selling his securities is felt by most people as an impairment of their power to protect such property. And of course there are other motives for selling property besides concern about a deterioration in its value; forbidding one to sell one's property eliminates liquidity, which is one of the most important sticks in the bundle of rights that constitute ownership. And by doing so it creates risk, which most investors don't like. Stop-loss orders are common enough, and clearly respond to a felt need to be able to truncate the downside risk of owning common stock.

This case is not as extreme as it would be if it were clear that the prison forbids all communication between King and his broker. Assuming the prison really is willing to allow King to correspond by mail with his broker, the prison is impairing King's ability to protect his property by delaying his transactions, but it is not destroying that ability. How grave the impairment is we cannot say on this limited record; it is conceivable, however, that forbidding King to telephone his broker could be an actionable deprivation of property, and his claim was therefore prematurely dismissed. We add that the impairment is not so grave that it could not readily be justified by security or other concerns, but, to repeat, these have not been argued.

There is a further wrinkle. Although both King and the prison focus on telephone communication and the prison claims that he's free to use the mails to reach his broker, the complaint alleges that the prison denies King's "right to *contact* his broker" (emphasis added), and interpreted literally this would include writing him. King argues moreover that the prison *is* refusing to allow him to use the mail to reach the broker, and as the argument is consistent with the vague "contact" allegation it is proper to make in opposition to the dismissal of the complaint. This is a matter to be clarified on remand.

The refusal to allow King to obtain a book on computer programming presents a substantial First Amendment issue. Freedom of speech is not merely freedom to speak; it is also freedom to read. *Stanley v. Georgia*, 394 U.S. 557, 564 (1969); *Lamont v. Postmaster General*, 381 U.S. 301, 306-07 (1965); *Conant v. Walters*, 309 F.3d 629, 643 (9th Cir. 2002). Forbid a person to read and you shut him out of the marketplace of ideas and opinions that it is the purpose of the free-speech clause to protect. Not that there aren't valid penological reasons for limiting prison inmates' access to certain types of book. *Bahrampour v. Lampert*, 356 F.3d 969, 973-74 (9th Cir. 2004); *Duamutef v. Hollins*, 297 F.3d 108, 113 (2d Cir. 2002); *Mauro v. Arpaio*, 188 F.3d 1054 (9th Cir. 1999); *Chriceol v. Phillips*, 169 F.3d 313, 315-16 (5th Cir. 1999). A prison need not allow prisoners to buy books detailing famous prison escapes, *Wolf v. Ashcroft*, 297 F.3d 305, 309 (3d Cir. 2002); *Amatel v. Reno*, 156 F.3d 192, 207 (D.C. Cir. 1998) (dissenting opinion), or even, we suppose, books on how to make yourself as strong as Mike Tyson through exercise. Cf. Zimmer Amendment, Pub. L. No. 107-77, § 611, 115 Stat. 748, 800 (2001), Cal. Penal Code § 5010(b), (c)(1) (2004); Miss. Code Ann. § 47-5-124(3) (1994); Ohio Rev. Code Ann. § 341.41(B)(1) (1998); Wash. Rev. Code § 72.09.500 (1995);

Michael Dobie, "Sports in Prison," *Newsday* (New York), July 11, 2004, p. A4; Dan Morain, "More Inmate Privileges Fall in Get-Tough Drive," *Los Angeles Times*, Feb. 9, 1998, p. A1. Were King in prison for computer hacking or other computer-related crimes, the prison could, in the interest of rehabilitation (i.e., preventing recidivism), *McKune v. Lile*, 536 U.S. 24, 34-35 (2002); *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987), forbid him to buy a book that would enable him to increase his ability as a hacker when he's released. Cf. *Banks v. Beard*, 399 F.3d 134, 140 (3d Cir. 2005); *United States v. Scott*, 316 F.3d 733, 736-37 (7th Cir. 2003). But he claims to want the book precisely for purposes of rehabilitation—to equip him to work as a programmer when he is released. That is a proper goal; whether it is his actual goal the record does not enable us to determine.

The only reason the prison has given for not wanting King to have the book he ordered, which teaches C++, a standard language in which computer programs are written, is that he might write programs with it that would disrupt the prison's computer system. However, computers that prisoners are permitted to use are not connected to the prison network, or any other network. The prison's lawyer speculates that King might write a program that contained a computer virus, put it on a diskette, and then break into a room in which there is a computer used by prison employees and connected to the prison network, insert the diskette, and infect the network. This seems far-fetched but in any event, as an argument found only in the government's brief, does not defeat King's claim. He has made a prima facie claim of infringement of his freedom of speech, and the government must present some evidence to show that the restriction is justified by the need to protect the prison's computer system. *Lindell v. Frank*, 377 F.3d 655, 658 (7th Cir. 2004); *Antonelli v. Sheahan*, 81 F.3d 1422, 1433 (7th

Cir. 1996); *Ramirez v. Pugh*, 379 F.3d 122, 128 (3d Cir. 2004); cf. *Shimer v. Washington*, 100 F.3d 506, 509-10 (7th Cir. 1996).

The suit, in short, was terminated prematurely as to the warden (and therefore, contrary to the district judge, does not count as King's third strike), although properly dismissed as to the Bureau of Prisons.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

A true Copy:

      Teste:

 

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*