William F. WEST, Plaintiff,

v.

Matthew FRANK, Richard Schneiter, Gerald Berge, Vicki Sebastian, Bradley Aspenson, Timothy Laxton And Leonard Johnson [1], Defendants.

No. 06–C–269–C.

United States District Court, W.D. Wisconsin.

June 27, 2007.

---

1. In his amended complaint, plaintiff identified the last three defendants as "Prison Guard Aspenson," "Prison Guard Laxton" and "Prison Guard Johnson." Counsel for defendants has identified the full names of these defendants in the summary judgment materials and I have amended the caption accordingly.

William F. West, Oshkosh Correctional Institution Oshkosh, WI, for Plaintiffs.

Ma. Manee Moua, Assistant Attorney General, Wisconsin Dept. of Justice, Madison, WI, for Defendants.

## OPINION AND ORDER

BARBARA B. CRABB, District Judge.

Plaintiff William West, a prisoner, wanted to stay abreast of the nation's current

events while he was incarcerated. To accomplish this, he subscribed to *USA Today* using his own funds. Some might be surprised to learn that prison authorities at the Wisconsin Secure Program Facility (where plaintiff was incarcerated) did not approve of plaintiff's efforts to stay informed. Instead, they refused to deliver the newspaper, citing a prison policy that prohibited prisoners from receiving publications in the mail so long as the prisoners were on "Level 1" or "Level 2" of the prison's behavior modification program.

In response, plaintiff filed this lawsuit under 42 U.S.C. § 1983, contending that the prison's publication ban violated his rights under the First Amendment. He seeks both monetary and injunctive relief. In addition, plaintiff contends that defendants violated his right to equal protection by throwing out his newspapers instead of saving them as they did for other prisoners. (Plaintiff brought other claims in his complaint, but I dismissed these when I performed the screening of his complaint required under 28 U.S.C. §§ 1915 and 1915A.)

■ Defendants have moved for summary judgment on both of plaintiff's claims. With respect to plaintiff's First Amendment claim, I conclude that defendants Matthew Frank and Vikki Sebastian may not be held liable because they had no involvement in the adoption or implementation of the publication ban. *Nanda v. Moss*, 412 F.3d 836 (7th Cir.2005). With respect to the remaining defendants, although I find the publication ban to be constitutionally dubious, plaintiff's damages claim is barred by the doctrine of qualified immunity because of the great uncertainty in the law regarding prison restrictions justified by a behavior modification theory. Further, plaintiff's request for injunctive relief is moot because the policy at issue has been abandoned and

because plaintiff has been transferred from the only Wisconsin prison that banned newspapers.

In addition, I conclude that plaintiff's equal protection claim must fail because plaintiff has failed to adduce any evidence that he was treated differently from other prisoners or that any differential treatment he received was intentional. Accordingly, I will grant defendants' motion for summary judgment.

Before setting forth the undisputed facts, I make one observation about the parties' proposed findings of fact. Each time plaintiff disputed any of defendants' proposed facts, defendants gave the following response:

> A specific response to defendants' proposed findings of fact is required by the Court's "Procedure to be followed on motions for summary judgment" (hereinafter Court Procedure). The plaintiff does not sufficiently dispute defendants' proposed finding of fact. Therefore, pursuant to Fed.R.Civ.P. 56(e) and Court Procedure II D and E, plaintiffs' response to defendants proposed findings must be disregarded and/or stricken from the record, and this proposed finding must be deemed undisputed.

The meaning of defendants' ongoing objection is not clear. Do defendants mean that plaintiff failed to set forth "specific facts" as required by Fed.R.Civ.P. 56 or do they mean that plaintiff's response was not directly responsive to their proposed fact? Although defendants repeat this objection numerous times, they never elaborate further or explain how the objection applies to a particular response provided by plaintiff. In any event, they raised the objection in a number of instances in which it was obviously inappropriate to do so.

■ For example, in defendants' proposed findings of fact nos. 42 and 43, de-

fendants state that defendant Laxton does not "recall" throwing out plaintiff's newspapers but that Laxton "would have" put any newspapers that he received for plaintiff in the property room. Plaintiff disputed this fact by saying that he personally observed defendant Laxton throwing out his newspaper, citing his own affidavit. This response was both sufficiently specific to satisfy Rule 56 and directly responsive to defendants' proposed fact. In fact, it was defendants' proposed fact that came up short because a statement by a witness that he "does not recall" a particular event happening is not enough to place in to dispute another witness's testimony that it did happen. *Tinder v. Pinkerton Security*, 305 F.3d 728, 735–36 (7th Cir.2002). In any event, I anticipate that in the future, counsel will consider more thoughtfully whether an objection is appropriate with respect to a particular response.

From the parties' proposed findings of fact and the record, I find the following facts to be undisputed.

## UNDISPUTED FACTS

Plaintiff William West was a prisoner at the Kettle Moraine Correctional Institution in Plymouth, Wisconsin from January 17, 2002, until September 24, 2002. In August 2002, plaintiff purchased a 13–week subscription for *USA Today,* a national daily newspaper, which plaintiff was permitted to receive at the Kettle Moraine prison.

On September 24, 2002, plaintiff was transferred to the Wisconsin Secure Program Facility in Boscobel, Wisconsin, where he stayed until February 2005. On September 26, 2002 a copy of *USA Today* addressed to plaintiff was delivered to the Boscobel prison. At the time, a prison policy called "Procedure Number 300, Subject: Level System Program" prohibited prisoners on Level 1 or Level 2 of the prison's behavior modification program from receiving publications, including newspapers and magazines. The policy was developed specifically for the Wisconsin Secure Program Facility. However, another policy gave prisoners the option of mailing out property that was not allowed or giving the property to one of the prisoner's visitors. Defendants Gerald Berge and Richard Schneiter, who were wardens of the Wisconsin Secure Program Facility while plaintiff was incarcerated there, were responsible for implementing the prison's policies.

In 2002, the secure program facility was intended to house Wisconsin prisoners with "serious behavioral problems." Some prisoners at the facility were serving long periods of disciplinary segregation as a consequence of their unwillingness to comply with prison rules. Others were administratively transferred there in response to assaultive conduct, gang activities or escape histories. Prisoners were placed in a "level system," a behavior modification program under which they were required "to earn their way out of a highly secured environment."

Prisoners began on Level 1, a very restrictive classification with few privileges. These were restricted to "limited" canteen and library access; one ten-minute telephone call a month, five hours of "leisure time activity" a week and "visiting as established by the DOC Administrative Code." Level 1 prisoners received no programming and were housed in isolated confinement.

A prisoner in the level system could advance to the next level and obtain greater privileges when prison authorities determined that the prisoner had sufficiently "demonstrated improvements in attitudes and behavior." The decision to "promote" a prisoner was made by the unit manager and unit team and was "highly individual-

ized" for each prisoner. The reviewing team members were "allowed to exercise their discretion in applying the level system." The purpose of this system was to "provide incentives for appropriate behavior."

As of September 26, 2002, plaintiff was on Level 1. When the newspaper arrived at the prison, defendant Bradley Aspenson, a correctional officer working on plaintiff's cell block, told plaintiff that he could not receive any publications until he reached Level 3.

Plaintiff moved to Level 2 in October 2002. On October 30, 2002, after another copy of *USA Today* arrived at the prison for plaintiff, defendant Leonard Johnson, a correctional officer, told plaintiff that he could not have the newspaper. Johnson put the newspaper in the garbage, mistakenly believing that was the appropriate course of action under prison policy.

Defendant Timothy Laxton was a correctional officer assigned to plaintiff's housing area in September and October 2002. Plaintiff saw Laxton throw out a copy of his *USA Today.*

Defendants Matthew Frank and Vikki Sebastian had no involvement in the enactment or implementation of Procedure Number 300.

In 2005, the level system was abandoned. Currently, all prisoners at the Secure Program Facility are allowed to have newspapers and other publications.

Plaintiff is now incarcerated at the Oshkosh Correctional Institution in Oshkosh, Wisconsin.

## OPINION

### A. First Amendment: Publication Ban

The right to be informed is one of the cornerstones of the First Amendment. As the Supreme Court has recognized many times, an informed and engaged citizenry is essential for a vital and robust democracy. *Garrison v. Louisiana,* 379 U.S. 64, 74–75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964) ("speech concerning public affairs is more than self-expression; it is the essence of self-government"); *Grosjean v. American Press Co.,* 297 U.S. 233, 250, 56 S.Ct. 444, 80 L.Ed. 660 (1936) ("informed public opinion is the most potent of all restraints upon misgovernment"). When a person is denied this right, he is "shut . . . out of the marketplace of ideas and opinions that it is the purpose of the free-speech clause to protect." *King v. Federal Bureau of Prisons,* 415 F.3d 634, 638 (7th Cir.2005) (Posner, J.). In fact, it is difficult to think of many situations more antithetical to the First Amendment than forcing ignorance on a segment of the population.

Of course, in the prison setting, all bets are off when it comes to how and to what extent the First Amendment should be applied. However, in almost all cases involving a policy that restricts a prisoner's First Amendment rights, prison officials rely on their interest in safety or security to justify the restriction. *E.g., Shaw v. Murphy,* 532 U.S. 223, 231, 121 S.Ct. 1475, 149 L.Ed.2d 420 (2001); *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 350–51, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987); *Turner v. Safley,* 482 U.S. 78, 91–92, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987); *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 132–33, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977). And with respect to restrictions on publications in particular, the almost universal justification is that the publication's content or form presents a security threat. *Thornburgh v. Abbott,* 490 U.S. 401, 416–17, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989); *Bell v. Wolfish,* 441 U.S. 520, 550, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *West v. Berge,* 2005 WL 1378908, *5 (W.D.Wis.2005). *See also*

American Correctional Association, Standards for Adult Correctional Institutions (4th ed. 2003) ("Restriction to access [to publications] should be related directly to maintenance of institutional order and security.")

■ Even when security interests support limitations on a prisoner's reading materials, courts scrutinize those limitations carefully, particularly in this circuit. It is probable that prisoners have had greater success on censorship claims in this circuit than on any other First Amendment claim. *E.g., King,* 415 F.3d 634 (reversing dismissal of prisoner's claim that defendants refused to allow plaintiff to purchase book on computer programming); *Lindell v. Frank,* 377 F.3d 655, 659 (7th Cir.2004) (ban on newspaper clippings violated prisoner's First Amendment rights); *Kikumura v. Turner,* 28 F.3d 592, 594 (7th Cir.1994) (reversing summary judgment in favor of prison officials on prisoner's challenge to ban on foreign language materials); *Jackson v. Elrod,* 881 F.2d 441, 445 (7th Cir.1989) (denying qualified immunity to prison officials that banned all hardcover books). *See also* United Nations Congress on Prevention of Crime and Treatment of Offenders, Standard Minimum Rules for the Treatment of Prisoners (1955), cited in *Estelle v. Gamble,* 429 U.S. 97, 103 n. 8, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), Rule 39 ("Prisoners shall be kept informed regularly of the more important items of news by the reading of newspapers, periodicals or special institutional publications, by hearing wireless transmissions, by lectures or by any similar means as authorized or controlled by the administration.").

Defendants do not assert a security interest in this case. They do not suggest that plaintiff has a history of misusing newspapers or other materials in his cell or that he generally has violent tendencies.

Rather, their sole justification for the publication ban is behavior modification. In other words, defendants' theory is that by depriving prisoners of publications, as well as nearly all other property, privileges and even human contact, this will act as an incentive on the prisoner to improve his behavior.

Of course, as a general matter, there is nothing problematic about an attempt to improve a prisoner's behavior. After all, rehabilitation is one of the primary purposes of incarceration. *O'Lone,* 482 U.S. at 351, 107 S.Ct. 2400. But as the Supreme Court has recognized, the ordinary meaning of "rehabilitation" is preparation for release back into society. *McKune v. Lile,* 536 U.S. 24, 36, 122 S.Ct. 2017, 153 L.Ed.2d 47 (2002) (plurality opinion) (noting that rehabilitation is objective of corrections system because "most offenders will eventually return to society"). *See also King,* 415 F.3d at 638–39 (stating that rehabilitation interest would justify ban on book prisoner could use to commit crimes). It is difficult to see how depriving a prisoner of nearly all knowledge about the outside world could help prepare the prisoner for his eventual return to that world. *Cf. Procunier v. Martinez,* 416 U.S. 396, 412–13, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974) ("the weight of professional opinion seems to be that inmate freedom to correspond with outsiders advances rather than retards the goal of rehabilitation"); *In Re Medley,* 134 U.S. 160, 168, 10 S.Ct. 384, 33 L.Ed. 835 (1890) (noting that "experience demonstrated ... serious objections" to "complete isolation of [a] prisoner from all human society," including failure to "recover sufficient mental activity to be of any subsequent service to the community").

It is troubling that defendants rely solely on an interest in behavior modification to justify a restriction on a prisoner's constitutionally protected activity, particularly

when the restriction imposed has no relationship to the negative behavior being targeted, as in this case. The danger of defendants' theory was recognized by Judge Tatel in *Kimberlin v. U.S. Dept. of Justice*, 318 F.3d 228, 239–40 (D.C.Cir. 2003) (Tatel, J., concurring in part and dissenting in part). Because by definition all prisoners are in need of behavior modification, there is no logical stopping point for using such a rationale. Any deprivation of a constitutional right could be justified on the ground that its purpose is to act as an incentive for rehabilitation or as a disincentive for returning to prison after release. In fact, under this theory, the harsher the restriction, the better it is because it is more likely to deter bad behavior.

Given the potentially boundless nature of a behavior modification justification, one might argue plausibly that prison officials should be entitled to less deference when that is their sole justification for a restriction. After all, one of the primary reasons cited by the Supreme Court for giving prison officials deference in many instances is that a "strict[er] standard simply [is] not appropriate for consideration of regulations that are centrally concerned with the maintenance of order and security." *Thornburgh*, 490 U.S. at 409–10, 109 S.Ct. 1874. And it makes obvious sense to tie the standard of review to the importance of the government interest and to afford government actors greatest discretion when basic safety is implicated. But when the government's asserted interest does not require the same degree of discretion as a security interest, "a closer fit between the regulation and the purpose it serves may safely be required." *Id.* at 412, 109 S.Ct. 1874.

Additionally, the Court has held that heightened deference in prisoner cases applies "only to rights that are inconsistent with proper incarceration." *Johnson v. California*, 543 U.S. 499, 510, 125 S.Ct. 1141, 160 L.Ed.2d 949 (2005) (emphasis in original) (internal quotation marks omitted). Of course, restrictions on visitation, *Overton v. Bazzetta*, 539 U.S. 126, 131, 123 S.Ct. 2162, 156 L.Ed.2d 162 (2003), or group protests, *Jones*, 433 U.S. at 126, 97 S.Ct. 2532, are inherent in incarceration and "part of the penalty" a prisoner pays for his offense. *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). But the right to remain informed and educated about the world is not a right "that need necessarily be compromised for the sake of proper prison administration." *Johnson*, 543 U.S. at 510, 125 S.Ct. 1141.

The Supreme Court has not directly addressed the arguments that weigh in favor of giving greater scrutiny to policies similar to the one at issue in this case, but in *Beard v. Banks*, —— U.S. ——, 126 S.Ct. 2572, 165 L.Ed.2d 697 (2006), a plurality of the Supreme Court assumed, as the parties in that case had done, that the deferential standard forth in *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), applied to prisoner cases involving First Amendment restrictions justified by a behavior modification rationale. Under that test, the question is whether the restriction is "reasonably related to legitimate penological interests," and is not an "exaggerated response" to those interests. *Id.* at 87, 107 S.Ct. 2254. Applying this standard to the facts of *Beard*, the plurality concluded that prison officials were entitled to summary judgment in a class action in which the prisoners challenged a publication ban. (Four justices joined the plurality, two justices concurred in the judgment, two justices dissented and one justice took no part in the case.)

The similarities between this case and *Beard* are significant. Contrary to defen-

dants' suggestion, however, in *Beard,* the Court did not issue a blanket ruling that all prisoner publication bans are constitutional if they are premised on behavior modification. Rather, the plurality emphasized that it was not "impossible for prisoners or others attacking a prison policy like the present one ever to succeed or to survive summary judgment." *Beard,* 126 S.Ct. at 2581. The plurality limited its holding to the facts available in the record before it.

Further, the plurality made it clear that the prison officials have the initial burden to demonstrate an adequate justification for the restriction. The First Amendment "requires prison authorities to show more than a formalistic logical connection between a regulation and a penological objective." *Id.* at 2581. Rather, they must show "a reasonable relation" between the restriction and legitimate penological interests. *Id.* at 2580. *Accord King,* 415 F.3d at 639 (Posner, J.) ("the government must present some evidence to show that the restriction is justified").

In determining whether a reasonable relationship exists, the Supreme Court usually considers four factors: whether there is a "valid, rational connection" between the restriction and a legitimate governmental interest; whether alternatives for exercising the right remain to the prisoner; what impact accommodation of the right will have on prison administration; and whether there are other ways that prison officials can achieve the same goals without encroaching on the right. *Overton,* 539 U.S. at 132, 123 S.Ct. 2162; *Turner,* 482 U.S. at 89, 107 S.Ct. 2254. However, in *Beard,* 126 S.Ct. at 2580, the Court acknowledged that a straightforward application of those factors makes little sense because the third and fourth factors will always favor prison officials when the asserted interest is behavior modification.

As noted above, in the view of the prison officials, any accommodation of the right will prevent them from fully advancing their interest; if they lessen the burden on the right, it weakens the incentive. Thus, the Court considered the more general question whether the policy was a reasonable one. *Id.*

Under this standard, I cannot conclude that defendants have met their burden on summary judgment to show as a matter of law that the publication ban is constitutional as it was applied to plaintiff. First, in their brief, defendants ignored *Beard's* modification of the *Turner* standard and instead addressed each of the four *Turner* factors. In doing so, defendants failed to argue that there was a logical or reasonable connection between the publication ban and their asserted interest. Instead, they simply cited *Beard* for the proposition that improving prisoner behavior is a legitimate penological goal. Dfts.' Br., dkt. # 19, at 8. This was a mistake. As *Beard* itself demonstrates, it is not enough for the interest to be a valid one; defendants must also show that the interest is furthered by the ban.

Even if I look directly to the record for evidence that supports the ban, defendants have not met their burden on summary judgment. The most obvious deficiency in defendants' evidence is that they have failed to make any showing that their behavior modification rationale applies to plaintiff. The facts show that some and perhaps even most prisoners at the Wisconsin Secure Program Facility in 2002 were transferred to the prison because of their lack of compliance with prison rules, but defendants adduced no evidence that plaintiff was such a prisoner. In fact, defendants failed to propose any facts about behavioral problems plaintiff may have had while in prison. Because the recalcitrance of the prisoners at issue in

*Beard* was emphasized numerous times by the plurality in that case, 126 S.Ct. at 2575, 2576, 2579, 2580, 2581, defendants' failure to adduce any evidence on this point is significant.

Also missing from the record is any evidence that defendants' behavior modification program actually worked. In *Beard,* 126 S.Ct. at 2581, the prison officials demonstrated a limited but clear success rate with their program. By contrast, the only clue defendants provide regarding the effectiveness of their publication ban is the fact that it was abandoned in 2005. Although defendants do not say why, it was likely not because of the ban's demonstrated ability to reform unruly prisoners.

Ultimately, the only "evidence" supporting the ban as it was applied to plaintiff is defendants' own assertion that it was appropriate. But if the First Amendment is to have any meaning in the prison setting, a reason of "because we said so" without further support cannot be sufficient to pass constitutional muster. *Thornburgh,* 490 U.S. at 414, 109 S.Ct. 1874 (stating that *Turner* standard is not "toothless").

 Although I conclude that there are issues of fact regarding the constitutionality of the publication ban as it was applied to plaintiff, this does not mean necessarily that plaintiff is entitled to relief. Plaintiff asked for both an injunction to stop enforcement of the ban and damages for the newspapers he lost under the policy, but only the claim for damages remains in play. The claim for injunctive relief is now moot because defendants have changed the policy and, more important, because plaintiff has been transferred from the only Wisconsin prison that imposed the publication ban. *Lehn v. Holmes,* 364 F.3d 862, 871 (7th Cir.2004) ("When a prisoner who seeks injunctive relief for a condition specific to a particular prison is transferred out of that prison, the need for relief, and hence the prisoner's claim, become moot.").

 With respect to plaintiff's damages claim, defendants have raised a defense of qualified immunity. That term is legal jargon for the Supreme Court's concern that too many lawsuits will interfere with public officials' ability to carry out their duties. *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Thus, under the doctrine of qualified immunity, public officials are not liable for damages under 42 U.S.C. § 1983 unless their conduct violates "clearly established law." *Brosseau v. Haugen,* 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004); *Hope v. Pelzer,* 536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). In other words, the question is whether the case law at the time of the events giving rise to the lawsuit put the defendants on notice that they were violating the Constitution. *Alexander v. City of Milwaukee,* 474 F.3d 437, 446 (7th Cir.2007). In practice this means that the plaintiff must point to a Supreme Court case, a case from the relevant court of appeals or "a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." *Wilson v. Layne,* 526 U.S. 603, 617, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999).

 Once the defendant has raised a qualified immunity defense, the plaintiff has the burden to show that it should not apply. *Mannoia v. Farrow,* 476 F.3d 453, 457 (7th Cir.2007). Plaintiff does not even attempt to do this in his brief. The one sentence he devotes to the issue of qualified immunity relates to his equal protection claim. For this reason alone, I must grant defendants' motion for summary judgment as it relates to plaintiff's First Amendment claim.

■ However, even if plaintiff had attempted to overcome qualified immunity, it is unlikely that he would have succeeded. Before *Beard*, few courts had considered the viability of a claim challenging a prison restriction premised on a theory of behavior modification; the Court of Appeals for the Seventh Circuit was not among those few. Those courts that did consider such restrictions came to different conclusions about the showing that prison officials must make. *Compare Little v. Norris*, 787 F.2d 1241, 1243–44 (8th Cir.1986); *Daigre v. Maggio*, 719 F.2d 1310, 1313 (5th Cir. 1983); *Kimberlin v. U.S. Dept. of Justice*, 150 F.Supp.2d 36, 45 (D.D.C.2001); *with Jacklovich v. Simmons*, 392 F.3d 420, 429 (10th Cir.2004); *Spellman v. Hopper*, 95 F.Supp.2d 1267, 1281 (M.D.Ala.1999). Thus, I cannot say that there was a consensus of cases demonstrating that defendants' actions were unconstitutional.

To the extent *Beard* explained the circumstances under which a behavior modification theory was appropriate, that decision cannot help plaintiff because it was decided almost four years after he was denied the newspaper subscription. Particularly because even this court has upheld similar policies related to the facility's level system in the past, *King v. Frank*, 371 F.Supp.2d 977, 984 (W.D.Wis.2005), I cannot conclude that the law in this area was sufficiently clear in 2002 to justify an award of monetary damages.

### B. *Equal Protection: Discarding Plaintiff's Newspapers*

In his complaint, plaintiff alleged that defendants were discriminating against him by throwing out his newspapers and no other prisoner's. Because I could discern no rational basis for this allegedly discriminatory treatment, I allowed plaintiff to proceed on an equal protection claim under a "class of one" theory, which means that plaintiff believes defendants treated him differently for reasons unique to him, rather than because he was a member of a particular group.

■ Plaintiff bears the burden of proving this claim, *Discovery House, Inc. v. Consolidated City of Indianapolis*, 319 F.3d 277, 283 (7th Cir.2003), but he has failed to do so in at least two basic respects. First, plaintiff has failed to adduce any evidence that in fact he was treated differently from other prisoners. Although he alleged in his complaint that other prisoners' prohibited publications were saved, he did not come forward with any evidence of this in response to defendants' motion for summary judgment. Second, even if defendants had treated plaintiff differently, he would have to show that the differential treatment was intentional, *Maulding Dev., LLC v. City of Springfield*, 453 F.3d 967, 969 (7th Cir. 2006), and he has failed to do so. Rather, the facts show that officers discarded his newspapers because of a mistaken belief about proper procedure, not out of any dislike for plaintiff.

Plaintiff's only argument on this claim is a citation to *Crawford–El v. Britton*, 523 U.S. 574, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998), but that case does not help him. In *Crawford–El*, the Court held that the burden of proving intent in a civil rights case brought by a prisoner is the same as in a case brought by any other plaintiff. But the Court did not hold that prisoners have no burden at all; "the plaintiff may not respond simply with general attacks upon the defendant's credibility, but rather must identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden of proving the pertinent motive." *Id.* at 600, 118 S.Ct. 1584. Because plaintiff failed to do this, defendants' motion for summary judgment must be granted with respect to plaintiff's equal protection claim.

## ORDER

IT IS ORDERED that the motion for summary judgment filed by defendants Matthew Frank, Richard Schneiter, Gerald Berge, Vikki Sebastian, Leonard Johnson, Timothy Laxton and Bradley Aspenson is GRANTED. The clerk of court is directed to enter judgment in favor of defendants and close this case.