In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-1532

JAMES MUNSON,

*Plaintiff-Appellant*,

*v.*

DONALD GAETZ, Warden, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 3:10-cv-00881-GPM—**G. Patrick Murphy**, *Judge.*

ARGUED DECEMBER 8, 2011—DECIDED MARCH 9, 2012

Before MANION, ROVNER, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* James Munson, an Illinois Department of Corrections prisoner serving a life sentence, alleged in a pro se 42 U.S.C. § 1983 complaint that prison officials violated his constitutional rights by barring him from personally possessing two of the six books he had shipped to the prison. The district court found that Munson failed to state a claim upon which relief may be granted. We affirm.

## I. Background

We accept as true Munson's allegations given that the district court dismissed his complaint for failure to state a claim. *See Smith v. Peters*, 631 F.3d 418, 419 (7th Cir. 2011). Munson suffers from a chronic medical condition as well as a variety of medical ailments that require him to take several prescription drugs on a daily basis. Because he is incarcerated, Munson relies on prison personnel for the accuracy of his medications and dosages. Munson once became ill because someone accidentally gave him another inmate's medication for twelve days. Given the life-threatening nature such incidents pose, Munson has taken to educating himself about his medications. Munson wants to know about side effects, whether various mixtures of the medications for his chronic condition and his other ailments could cause illness or death, and if he should avoid certain foods. His lack of knowledge causes stress and mental anguish and makes him leery of taking other medications even though prescribed by a physician.

Munson turned to the prison library, which allows inmates to check out books to take back to their cells and photocopy books' pages to keep in their permanent collections. But Munson found that long waiting lists and frequent prison lockdowns impaired his access to the information he wanted. So Munson ordered six books from a prison-approved bookstore. Some of the books included *Carpe Diem: Put A Little Latin in Your Life*, *Diversity and Direction in Psychoanalytic Technique*, and *Neurodevelopmental Mechanisms in Psychopathology*.

Munson's complaint indicates that a prison official sent the *Physicians' Desk Reference* (*PDR*) and the *Complete Guide to Prescription & Nonprescription Drugs 2009* (*Complete Guide*) to the prison's publication reviewers for further screening. We know from "Publication Review Determination and Course of Action" forms attached to his complaint that publication review officer Lisa Shemonic decided Munson could not have the *Complete Guide* and the *PDR*. To justify the decision, Shemonic provided three reasons for both books. Shemonic simply checked the available boxes for the first two reasons: the books were "listed on the Disapproved Publications List," and the books contained material deemed "otherwise detrimental to security, good order, rehabilitation, or discipline, or it might facilitate criminal activity or be detrimental to mental health." The third reason was more specific. Shemonic checked the box indicating that the books contained "other" material and specified "DRUGS" on the blank line. In the forms' comment section, Shemonic typed "ON THE DISAPPROVED LIST." Munson alleges in his complaint that "many other" inmates possessed "these kinds of medical" books and that these particular books may be available in the prison's library. Munson alleges that Shemonic told him that even though the same books may be in the prison library, prison officials did not want inmates "to have the books in [their] cells or have personal ownership of the books." Munson filed a grievance but prison officials affirmed the decision. Munson's complaint suggests that prison officials mailed the books somewhere and his counsel stated at oral argument that it was his understanding that the books went to Munson's family.

Munson filed a pro se 42 U.S.C. § 1983 complaint alleging that the restriction violated his First, Eighth, and Fourteenth Amendment rights. The district court screened Munson's complaint, 28 U.S.C. § 1915A(a), and dismissed it with prejudice for failing to state a claim upon which relief may be granted, *id.* § 1915A(b)(1). The court noted that it appeared from Munson's complaint that the prison's policy allowed prisoners to have limited access to books about prescription drugs but not personal ownership. The court explained that it:

> can imagine many illicit uses to which books like the *PDR* and the *Complete Guide* could be put if . . . prisoners were allowed unfettered access to such materials, including, inter alia, drug trafficking, drug abuse, and plotting suicide attempts, all of which are, of course, activities highly detrimental to prison security and discipline.

*Munson v. Gaetz, et al.*, No. 10-881-GPM, 2011 WL 692015, at *3 (S.D. Ill. Feb. 17, 2011). The court found the prison's decision to restrict Munson's access to the *PDR* and the *Complete Guide* reasonable. The court dismissed the Eight Amendment claim because Munson only alleged "quibbles" with the prison doctors' prescriptions and the Fourteenth Amendment claim because Munson failed to allege a constitutionally protected property interest. *Id.* The dismissal counted as a strike against Munson. *See* 28 U.S.C. § 1915(g).

## II. Analysis

We review the dismissal of Munson's complaint de novo. *Ortiz v. Downey*, 561 F.3d 664, 669 (7th Cir. 2009). We accept well-pleaded facts as true but not legal conclusions or conclusionary allegations that merely recite a claim's elements. *McCauley v. City of Chicago*, No. 09-3561, 2011 WL 4975644, at *4 (7th Cir. Oct. 20, 2011) (citing *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1951 (2009)). We must determine whether the "factual allegations 'plausibly suggest an entitlement to relief,'" *id.* (quoting *Iqbal*, 129 S. Ct. at 1951), to a degree that rises "above the speculative level," *id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The "plausibility determination is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id.* (quoting *Iqbal*, 129 S. Ct. at 1950). Although the 1995 Prison Litigation Reform Act "mandates early judicial screening of prisoner complaints," *Jones v. Bock*, 549 U.S. 199, 202 (2007), we still consider pro se complaints liberally and hold them to a less stringent standard than pleadings drafted by lawyers, *see Maddox v. Love*, 655 F.3d 709, 718 (7th Cir. 2011) (citing *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)).

Munson argues that the district court erred in dismissing his complaint before taking evidence supporting the penological interest justifying the prison's decision to restrict his access to the books. Munson maintains that the district court improperly relied on its own speculation and that his complaint's factual allegations sufficiently stated a claim that the government wrongly deprived him of his First Amendment rights.

A prison's refusal to allow an inmate access to a book "presents a substantial First Amendment issue. Freedom of speech is not merely freedom to speak; it is also freedom to read." *King v. Fed. Bureau of Prisons*, 415 F.3d 634, 638 (7th Cir. 2005) (citing cases). Forbidding someone the right to read shuts "him out of the marketplace of ideas and opinions," which is what the Free Speech Clause protects. *Id.* Yet prisons may have "valid penological reasons for limiting prison inmates' access to certain" books, such as those discussing famous prison escapes or perhaps even books about making oneself stronger. *Id.* But the prison must still justify its interest in restricting access to the particular book. Given that the prison restricted Munson's First Amendment rights by denying him the books, the restriction "is valid only if it is reasonably related to legitimate penological interests." *Lindell v. Frank*, 377 F.3d 655, 657 (7th Cir. 2004). Under *Turner v. Safley*, we consider four factors to judge the restriction's constitutionality: (1) the validity and rationality of the connection between a legitimate and neutral government objective and the restriction; (2) whether the prison leaves open "alternative means of exercising" the restricted right; (3) the restriction's bearing on the guards, other inmates, and the allocation of prison resources; and (4) the existence of alternatives suggesting that the prison exaggerates its concerns. 482 U.S. 78, 89-91 (1987).

Munson's appeal focuses on the district court's justification for the restriction's rationality—that the court could "*imagine* many illicit uses to which" prisoners could put the books. *Munson*, 2011 WL 692015, at *3

(emphasis supplied). We do not need to decide whether the court erred in phrasing its ruling in terms of imagining problems with the books because the attachments to Munson's complaint provided the prison's legitimate penological interest in restricting his access. Quite simply, the prison gave the books' drug-related content as one of the reasons justifying its decision to restrict Munson's access to the books and we don't need to look beyond the books' titles and the content of Munson's complaint to know that the books contain information about drugs. Assessing the rational relationship between (A) the unquestionably legitimate and neutral government objective of restricting prisoner access to drug-related information and (B) the prison's decision to bar Munson from personally possessing the *PDR* and the *Complete Guide* takes no leap of logic or imagination. Perhaps the publication review officer could have said more than just stating the obvious that the books contained information about "DRUGS." Yet just as prison officials wouldn't need to say much in restricting access to books containing information about how to make knives, or how to pick locks, there isn't much to say in justifying a decision to restrict access to books containing information about drugs.

Munson reminds us that we shouldn't judge the books based on their covers. *See generally* 1 George Eliot, *The Mill on the Floss* 24 (1860) ("They was all bound alike—it's a good binding, you see—and I thought they'd be all good books . . . they've all got the same covers, and I thought they were all o' one sample, as you may say. But it seems one mustn't judge by th' out-

side."). Affirming though doesn't require even a glance at the books' covers because Munson's complaint says he wanted the books because of their drug-related content. Complaint at ¶¶ 21-25. Munson argues that the prison's reference to drugs on the publication review form merely recited boilerplate language. Maybe the statement "DRUGS" qualifies as boilerplate. But just as the prison could use a form to explain its reasons for denying Munson possession of the books, the prison could use efficient yet sufficient boilerplate to justify its decision to restrict books containing drug-related content. Because we can readily discern the validity and rationality of the connection between this legitimate penological interest and restricting access to such books, the district court did not err in finding the prison's restrictions reasonable.

Munson seeks to place his case in the company of a trio of decisions where we found that the district courts erred in dismissing at the screening stage. Yet in each of these cases, efforts to bridge the gulf between the restriction and a penological interest caused uncertainty on appellate review because either the complaint didn't provide the prison's interest or the restriction's basis was just not legitimate or plausible. Unlike these cases, Munson's complaint doesn't cause us any trouble in recognizing the government's legitimate interest and the bridge between that and the restriction.

In *Lindell*, we held that although it might be possible to envision a justification for restricting a prisoner to a maximum of five postcards, the dismissal of the

complaint at the screening stage prevented us from actually knowing the reason behind the restriction. 377 F.3d at 657-58. The prisoner's complaint did not concede the existence of a policy or rule about postcards; rather, he alleged that the prison arbitrarily confiscated his postcards. *Id.* at 658. Dismissing the complaint at screening prevented the defendants from ever having to explain its basis for confiscating the postcards. *Id.* Unlike the prisoner in *Lindell*, Munson attached to his complaint the prison's basis for barring him from personally possessing the books and provided an admittedly short, but sufficient, supporting rationale.

In *Ortiz*, we found that the district court improperly assumed that a prisoner's requests for a rosary and a prayer booklet or pamphlet posed a security risk or were incompatible with his detention. 561 F.3d at 668-70. The grievances and replies attached to the prisoner's complaint showed that the prison's chief made the decision on the basis that as a Catholic the prison chief knew that those "items are not vital to worship." *Id.* at 669. This reason, based on a personal religious belief, was insufficient because a prisoner's religious beliefs "are not subject to restriction by the personal theological views of another." *Id.*; *see also Grayson v. Schuler*, 666 F.3d 450, 455 (7th Cir. 2012) ("Prison chaplains may not determine which religious observances are permissible because orthodox."). Here, the restriction rested on the legitimate interest in limiting access to books about drugs, not the publication review officer's personal beliefs about the books.

Most analogous to Munson's case is our decision in *King*, where we found that the district court prematurely dismissed a complaint before taking evidence supporting the decision to bar an inmate from a book about computer programming. 415 F.3d at 639. In its brief in *King*, the government explained that the prison did not want the prisoner to have the books because they were concerned he would write a computer program that would disrupt the prison's computer system. We found the idea, that the prisoner would somehow access the prison network to infect it with a virus, "far-fetched" and regardless, inadequate to defeat the prisoner's claim without "some evidence to show that the restriction is justified by the need to protect the prison's computer system." *Id.* Quite unlike *King*, the attachments to Munson's complaint, not a government brief, provided the prison's penological interest. And unlike the implausible scenario in *King* that had the prisoner breaking into a room to access a computer, connecting to the prison's computer network, and then somehow infecting the network with a virus, understanding the legitimacy of the prison's interest in restricting access to books containing information about drugs does not require accepting the possibility of some incredible chain of events.

Munson's complaint provided the prison's legitimate interest in restricting his access to the books and the rational connection between that interest and the restriction takes no imaginative dive into the depths of the prison officials' consciousness. *Cf. Ciarpaglini v. Saini*, 352 F.3d 328, 331 (7th Cir. 2003) (affirming a district

court on an alternative but adequate ground that the defendant "simply pled himself out of court by saying too much"). The books contain drug-related content and the prison restricted Munson's access to the books because of their drug-related content. There was little else to say. *Compare Amatel v. Reno*, 156 F.3d 192, 199 (D.C. Cir. 1998) (rejecting the need for "record evidence" because "common sense" does not have to "be the mere handmaiden of social science data or expert testimonials in evaluating congressional judgments" because "conformity to commonsensical intuitive judgments is a standard element of both reasonableness and rationality"), *and Giano v. Senkowski*, 54 F.3d 1050, 1054-55 (2d Cir. 1995) (holding that a valid and rational connection existed between the government's reasons for a policy because of "common sense"), *with Jones v. Brown*, 461 F.3d 353, 361-63 (3d Cir. 2006) (holding that although common sense may suffice in some instances, it did not afford a reasonable basis in this case), *Ramirez v. Pugh*, 379 F.3d 122, 128 (3d Cir. 2004) (holding that the connection between a restriction and the rehabilitative interest ceased to be "obvious upon consideration of the entire federal inmate population"), *Wolf v. Ashcroft*, 297 F.3d 305, 308 (3d Cir. 2002) (holding that although "the connection may be a matter of common sense in certain instances . . . there may be situations in which the connection is not so apparent and does require factual development"), *Reed v. Faulkner*, 842 F.2d 960, 963 (7th Cir. 1988) (rejecting "the piling of conjecture upon conjecture"); *Amatel*, 156 F.3d at 208 (Wald, J., dissenting) (reserving the possibility that the connection between a ban and

rehabilitation could be "so self-evident that no further evidence was necessary to demonstrate its reasonableness"), *and Giano*, 54 F.3d at 1059 (Calabresi, J., dissenting) (agreeing that some regulations are "so obviously related to legitimate penological concerns that challenges to them may be dismissed at the summary judgment stage based simply upon an (irrefutable) 'common sense determination'").

Munson next argues that the regulations governing possession of books are invalid. *See Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) (holding that "is not on the State to prove the validity of prison regulations but on the prisoner to disprove it"). Munson must overcome the substantial discretion granted prison officials in determining "appropriate means of furthering penological goals" because they "bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Id.* The challenged regulation survives if it bears a rational relation to legitimate penological interests. *Id.* (citing *Turner*, 482 U.S. at 89).

Munson alleges that "many other" inmates "have these kinds of medical" books in their possession. Complaint at ¶ 28. Munson's complaint doesn't explain what books other prisoners have or what level of access they have to those books. Regardless, these alleged "inconsistent results are not necessarily signs of arbitrariness or irrationality." *Thornburgh v. Abbott*, 490 U.S. 401, 417 n.15 (1989). The documents attached to Munson's complaint suggests that the prison's publication review process

involved individualized determinations. The six books Munson ordered passed through what appears to be an initial screening process. Of those six books, the prison allowed three of the books, one of which discussed psychoanalysis and another psychopathology, through the initial screening process without comment. (Munson's complaint doesn't say what happened to the sixth book.) The prison's individualized determination evidently leaves room for distinguishing books based on their content. That some prisoners have some type of access to books containing general medical information doesn't defeat the prison's decision to specifically restrict Munson's access to certain books containing information about drugs. *See Mays v. Springborn*, 575 F.3d 643, 649 (7th Cir. 2009) (per curiam) (holding that it "takes no great leap to understand the prison's reasons for wanting an article about a prison riot and images of gang signs" barred even though the prisoner "had access to other writings and to television shows about prison riots").

Munson challenges the restrictions on the basis of the books' availability in the prison library. This alternative access to the information contained within the *PDR* and *Complete Guide* does not undermine the prison's decision; rather, it simply suggests that under the second *Turner* factor Munson has "alternative means of exercising" his restricted right to access knowledge about drugs. 482 U.S. at 90. As noted by the Supreme Court in *Thornburgh*, attempts "to achieve greater consistency by broader exclusions might itself run afoul of" this factor by applying "a more broadly restrictive rule." 490 U.S. at

417 n.15 (citing Fyodor Dostoyevsky, *The House of the Dead* 40 (Penguin 1985) where prisoners were permitted to read only the Bible). "The exercise of discretion called for by these regulations may produce seeming 'inconsistencies,' but what may appear to be inconsistent results are not necessarily signs of arbitrariness or irrationality." *Id.* The availability of like-books for copying and borrowing from the prison library merely suggests that Munson had alternative, albeit more restricted, access to the books. Allowing reduced access does not mean that barring unfettered access is illegitimate, even if restricted access creates an appearance of inconsistency. *See Mays*, 575 F.3d at 649 (holding that the level of "deference we afford prisons permits such seeming inconsistencies").

The Eighth Amendment prohibits the government from inflicting "cruel and unusual punishments." U.S. Const. amend. VIII. Whether a punishment is unconstitutional depends on "'evolving standards of decency that mark the progress of a maturing society.'" *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958)). The denial of medical care may cause "pain and suffering which no one suggests would serve any penological purpose." *Id.* at 103. Thus, the "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain.'" *Id.* at 104 (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). For Munson's Eighth Amendment claim to survive, he must allege that he (1) "suffered an objectively serious harm that presented a substantial risk to his safety, and (2) the defendants were deliberately indif-

ferent to that risk." *Minix v. Canarecci*, 597 F.3d 824, 831 (7th Cir. 2010).

Munson cites in support of this claim his receipt of another person's medications, that mixing his medications improperly could cause death, and that he is concerned that prison physicians fail to prevent this. As problematic as these claims are, Munson fails to allege that the decision to deny him possession of the *PDR* and the *Complete Guide* constituted deliberate indifference. At most, Munson's alleges that certain prison officials made a mistake, not that they were deliberately indifferent. *See Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997) (holding that the Eighth Amendment "is not coterminous with a medical malpractice claim"); *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996) (requiring medical treatment to be "blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition"). Munson also does not allege that the defendants were involved in the alleged misprescription incident. *See Minix*, 597 F.3d at 833-34 (noting that § 1983 liability "requires 'personal involvement in the alleged constitutional deprivation'" (quoting *Palmer v. Marion Cnty.*, 327 F.3d 588, 594 (7th Cir. 2003))). Any possible indifference to Munson's medical needs rests not with the prison officials involved in the publication review process but with those involved in maintaining his prescription regime. The Eighth Amendment protects a prisoner's right to receive adequate treatment, *Forbes*, 112 F.3d at 266, not the right to have one's own set of books about drugs.

The Fourteenth Amendment prohibits the government from depriving "any person of . . . property, without due process of law." U.S. Const. amend. XIV, § 1. Munson asserts that the prison's decision to prohibit him from having the books deprived him of a property interest without due process. *See Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). This claim requires two levels of analysis: "First, we must determine whether the plaintiff was deprived of a protected interest; second, we must determine what process is due." *Leavell v. Ill. Dep't of Nat. Res.*, 600 F.3d 798, 804 (7th Cir. 2010) (quoting *Pugel v. Bd. of Trs. of Univ. of Ill.*, 378 F.3d 659, 662 (7th Cir. 2004). Munson's claim fails both. Given that prison officials legitimately barred Munson from around-the-clock-access to the books, he cannot claim that the prison denied him a protected property interest. We also question whether Munson alleges an actual deprivation of his property given that it appears from Munson's complaint, and from his counsel's statement at oral argument, that the prison sent the interdicted books to a member of his family. Although we have only recognized in an unpublished order that a prisoner is not deprived of a property interest when he is able to send the property to a destination of his choice, *see Faust v. Parke*, 114 F.3d 1191, 1997 WL 284598, at *1 (7th Cir. 1997) (table decision), the Tenth Circuit has repeatedly recognized this principle, *see Searcy v. Simmons*, 299 F.3d 1220, 1229 (10th Cir. 2002) (sending prisoner's property to relatives did not constitute a deprivation of property ownership); *Hatten v. White*, 275 F.3d 1208, 1210 (10th Cir. 2002) ("While an inmate's ownership of property is a protected

property interest that may not be infringed without due process, there is a difference between the right to own property and the right to possess property while in prison."); *Williams v. Meese*, 926 F.2d 994, 998 (10th Cir. 1991) (prisoner's retention of control over ring and postage stamps seized by prison officials, as indicated by the property's delivery to an address of the plaintiff's choosing, demonstrated that he had not been "deprived" of the property, although he lacked possession). Munson's complaint just alleges a prohibition against his possession of the books while in prison; he does not allege a deprivation of his ownership in the books. Munson's complaint also makes it clear that he received all the process he was due in the form of a written notice explaining why he couldn't possess the books and a meaningful chance to be heard by a series of prison officials. *Stewart v. McGinnis*, 5 F.3d 1031, 1037 (7th Cir. 1993) (noting that due process requires "a meaningful opportunity to be heard on" whether an item is contraband). Munson alleges that after the initial denial by the publication review officer, Complaint at ¶ 1, he was able to file a grievance with a counselor, *id.* at ¶¶ 3-4, followed by an appeal of that decision to two other officials, *id.* at ¶ 5. Munson took his case to the administrative review board, *id.* at ¶ 8, and then the prison director, *id.* Munson cannot complain now about the lack of a hearing because he does not allege that prison officials denied a request for a hearing. *See* Ill. Admin. Code tit. 20, § 504.830(c) ("An offender may be afforded an opportunity to appear before the Grievance Officer unless the grievance is deemed without merit.").

### III. Conclusion

We AFFIRM the district court's dismissal of Munson's complaint.